**SNAP–TITE, INC. and Eidco, Inc., Appellants,**

v.

**MILLCREEK TOWNSHIP.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 2002.
Decided Dec. 3, 2002.

---

Craig A. Markham, Erie, for appellants.

Evan E. Adair, Erie, for appellee.

BEFORE: McGINLEY, Judge, COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN.

Snap–Tite, Inc. and Eidco, Inc. (jointly Snap–Tite) appeal from the order of the Court of Common Pleas of Erie County, dated December 21, 2001, that sustained the preliminary objections of Millcreek Township (the Township) and denied Snap–Tite's Petition for Appointment of Viewers.

Snap–Tite is a Pennsylvania corporation engaged in the manufacturing business, and is the equitable owner of several parcels of land in Millcreek Township, Erie County, Pennsylvania (the property). It acquired the property, which was being fully utilized at the time, effective September 22, 1995, in connection with a merger acquisition of Autoclave Engineers Company (Transcript of Rule to Show Cause (Tr.), Day 1 at 3). Title to the property is

in Eidco, Inc., as a result of industrial development financing provided to Snap–Tite. Snap–Tite has three buildings on the property. It employs 250 people and does $35 million in gross yearly sales at this location. (Tr. Day 1 at 5).

Snap–Tite's property sits in a low-lying area of the Marshall Run watershed,[1] bordered on the south by West 22nd Street, on the west by the Erie Advanced Manufacturing plant, on the north by 2 sets of railroad tracks owned by Norfolk Southern Railroad (NS) and CSX Railroad (CSX), and on the east by Peninsula Drive, which is an elevated roadway four to six feet above ground level. Within the watershed, storm water generally travels from the south in a northerly direction toward the railroad tracks and Lake Erie. At the time Snap–Tite purchased the property, there were no ponds, basins or water retention areas on the parcel, and there are none today. Snap–Tite knew of no problems, water or otherwise, associated with the parcel, and did not ask any questions concerning the potential for flooding on the low-lying property. (Tr. Day 1 at 4, 29, 37).

The railroads constructed their tracks located to the north of Snap–Tite's parcel between 1880 and 1927. During that time, the railroads built two culverts[2] to allow water to flow to the northern side of the tracks. The culvert closest to the Snap–Tite property (identified as MRR3) is located several hundred feet northwest: the opening closest to the NS tracks is 36 inches in diameter; the opening closest to the CSX tracks is 48 inches in diameter. (Tr. Day 2 at 53). Ground water from sixty-six acres drains into this culvert. (*Id.* at 55). The second culvert (identified as MRR2) is located several hundred feet farther west: the opening closest to the NS tracks is 48 inches in diameter; at its end, CSX constructed a box culvert measuring 4 by 6 feet. (*Id.* at 53–55.) Ground water from 840 acres drains into this culvert. (*Id.* at 55.)

The first incident leading to this action began on September 17, 1996, when over six inches of rain fell in Erie. At that time, the ground was already saturated because the area had experienced rain on most of the preceding ten days. (Tr. Day 2 at 63). The culverts under the railroad tracks were unable to handle the volume of storm water. Consequently, water backed up on the northwest corner of the Snap–Tite property and flooded two of its buildings causing over $1.3 million in damages. Other property in the local area *also* flooded as a result of this storm. (Tr. Day 1 at 188). Snap–Tite restored operations three months later, but took no measures to protect against future flooding (Tr. Day 1 at 57–58 and Tr. Day 2 at 104–05).[3]

Sometime after this flooding, NS contacted Richard Morris, the civil engineer for the Township, and asked permission to increase the size of the culverts running under the tracks in the vicinity of the Marshall Run watershed. (Tr. Day 1 at

---

1. A watershed is an entire region or area drained by a river or other body of water, whether natural or artificial. Section 4 of the Storm Water Management Act, Act of October 4, 1978, P.L. 864, *as amended,* 32 P.S. § 680.4.

2. A culvert is "a transverse drain." Merriam–Webster's Collegiate Dictionary 282 (10th ed.2001).

3. According to expert testimony given by Clayton Fails, a civil engineer for Hill Engineering, Inc., *see* note 4, the owner of property subject to flooding could erect a detention facility, create a physical barrier on the property, or divert the flow of water to another location. (Tr. Day 2 at 61). *See also* expert testimony of Steven Halmi, a civil engineer for Richard A. Deiss and Associates. (Tr. Day 1 at 107, 163–64).

181). The Township did not approve the railroad's request because the railroad had not complied with the requirements in the Township's storm water management ordinance, i.e., "that any developer or anyone that wants to increase the size of any conveyance checks everything else out down the stream and is to be sure that downstream property owners are not flooded." (Tr. Day 2 at 34). As of the date of the hearing, December 11, 2001, NS had failed to provide the Township with a proposal as to how it could accommodate the additional flow so as to address the affect on downstream properties. (*Id.* at 37). According to Clayton Fails, the Township is not denying NS the ability to expand its culvert; it is merely instructing the railroad that it needs to proceed in accordance with the Township ordinance, and provide a plan that takes into consideration the downstream effects of water flow, of which the Township is already aware. (Tr. Day 2 at 84–85, 100–01).

4. On June 18, 1996, the area experienced a severe rainfall in the amount of 3.14 inches in a day's time. (Tr. Day 2 at 76). There were no indications that either Snap–Tite or the Township experienced any flooding. When asked to explain factors that might have differentiated the June 1996 storm from the other two major rainfall events which resulted in flooding, Clayton Fails, *see* note 3, explained that "there was no rainfall recorded in the days prior to the June 18, 1996 rain event. There was zero prior moisture reported by the airport." (Tr. Day 2 at 77).

5. On October 6, 2000, Snap–Tite entered into an agreement for the purchase of property in Summit Township. (Tr. Day 1 at 72). This new property is three times the size of the old property and offers a substantially larger building area. (*Id.* at 74, 76). It will allow Snap–Tite to increase the number of employees and will allow for future development. (*Id.*). Further, Snap–Tite received a LERTA designation on the new property, (Local Economic Revitalization Tax Assistance Act, Act of December 1, 1977, P.L. 237, *as amended,* 72 P.S. §§ 4722–4727), which provides it a tax exemption for five years on building con-

On August 2 and 3, 2000, another intense storm hit the Erie area after the ground had been saturated by previous rainfalls. (Tr. Day 2 at 75). Two inches of rain fell in a three-hour period. Again, the culverts were unable to handle the rush of storm water, and one of Snap–Tite's buildings flooded as a result, causing over $300,000 in damages.[4] Following this storm experience, Snap–Tite decided the property was not suitable for manufacturing operations because of the disruption to its business operations caused by the repeated flooding.[5]

Thus, on September 26, 2000, Snap–Tite filed a Petition for Appointment of Viewers pursuant to Section 1–502(e) of the Eminent Domain Code (Code) alleging a *de facto* taking by the Township.[6] The Township filed Preliminary Objections to the petition, claiming that Snap–Tite failed to set forth prima facie evidence of a *de facto* taking.[7] After the parties engaged in

struction and improvements. Snap–Tite *is* constructing a detention basin and entering into a storm water management maintenance agreement on its new property; both are Summit Township requirements. (*Id.* at 78–80).

6. Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §§ 1–101—1–903. This particular Section of the Code authorizes landowners to file a petition for the appointment of viewers where a compensable injury has been suffered and no declaration of taking has been filed. *Greger v. Canton Township,* 41 Pa.Cmwlth. 20, 399 A.2d 138, 139 (1979). Specifically, Section 502(e) provides:

(e) If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) of this section, setting forth such injury.

26 P.S. § 1–502(e).

7. "Preliminary objections are the exclusive method under the Code of raising objections

discovery, a hearing was held before the trial court on December 14 and 15, 2001.[8] The trial court denied Snap–Tite's petition, and published its opinion and order on December 21, 2001. This appeal followed.

On appeal, Snap–Tite argues that Township actions have resulted in a *de facto* taking of its property for which it should receive compensation. Specifically, Snap–Tite avers that the Township's storm water management system collects and diverts water from its natural flow, channeling it to an area west of Snap–Tite's property that overflows back onto its property during periods of heavy rain. Such flooding has allegedly resulted in extensive damage to Snap–Tite's property and assets. Snap–Tite claims that the Township provided no evidence that collected storm water would have flowed naturally to the same point on Snap–Tite's property if the collection system did not exist. Snap–Tite also avers that concerns over possible future flooding events prevent Snap–Tite's beneficial use and enjoyment of its property. It argues that the trial court's decision is not supported by substantial evidence, is contrary to applicable law and constitutes an abuse of discretion.

On the other hand, the Township argues that Snap–Tite did not meet its burden of establishing a *de facto* taking of its proper-ty. Specifically, the Township claims that Snap–Tite failed to prove that any Township action caused the flooding, or resulted in a substantial deprivation of Snap–Tite's beneficial use or enjoyment of its property. Further, the Township argues that the trial court did not abuse its discretion or commit an error of law in denying Snap–Tite's petition.

 Where the trial court has dismissed preliminary objections to a petition for the appointment of a board of viewers, our review is limited to a determination of whether the trial court abused its discretion or committed an error of law. *Borough of Boyertown*, 743 A.2d 990, 992 n. 2 (Pa.Cmwlth.1999). The fact finder must resolve evidentiary conflicts; the trial court's findings will not be disturbed if supported by substantial evidence. *Faleski v. Department of Transportation*, 159 Pa.Cmwlth. 548, 633 A.2d 1308, 1310 (1993).

 Our Supreme Court has held that a *de facto* taking occurs when "the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property." *Conroy–Prugh Glass Company v. Commonwealth* 456 Pa. 384, 388, 321 A.2d 598, 599 (1974) (*quoting Griggs v. Allegheny County*, 402 Pa. 411, 168 A.2d 123 (1961), *reversed on other grounds*, 369

---

to a petition for the appointment of a board of viewers alleging a *de facto* taking." *Genter v. Blair County Convention and Sports Facilities Authority*, 805 A.2d 51, 54 n. 6 (Pa.Cmwlth. 2002) (*citing Lehigh Northampton Airport Authority v. WBF Associates, L.P.*, 728 A.2d 981 (Pa.Cmwlth.1999)).

8. This Court has held that:
 [a] preliminary objection in a de facto taking case serves a broader purpose than the ordinary preliminary objections. The trial court must determine first whether, as a matter of law, the averments of the petition for the appointment of viewers, taken as

true, in addition to any stipulated facts, are sufficient to state a cause of action for a de facto taking ... If the averments, taken as true, *might* establish a de facto taking, the trial court must take evidence by depositions, or otherwise, *so that a judicial determination might be made.*
*Stein v. City of Philadelphia*, 125 Pa.Cmwlth. 225, 557 A.2d 1137, 1140 (1989) (emphasis in original). The trial court held a hearing pursuant to 26 P.S. § 1–406 and, thereafter, found no basis for Snap–Tite's claim that the Township exercised eminent domain powers in this case.

U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962)). Where a *de facto* taking is alleged,

> [P]roperty owners bear a heavy burden of proof and must show that exceptional circumstances exist which substantially deprive them of the use of their property and, further, that such deprivation is the direct and necessary consequence of the actions of the entity having the power of eminent domain.

*Lehigh–Northampton Airport Authority,* 728 A.2d at 985. "[E]ach case must be examined on its own factual situation." *Appeal of D.R.E. Land Developing, Inc.,* 149 Pa.Cmwlth. 290, 613 A.2d 96, 98 (1992).

■■ The law of surface waters basically states, "Water must flow as it is wont to flow." *LaForm v. Bethlehem Township,* 346 Pa.Super. 512, 499 A.2d 1373, 1377 (1985). Thus, "it is clear that only where water is diverted from its natural channel or where it is unreasonably or unnecessarily changed in quantity or quality has the lower owner received a legal injury." *Lucas v. Ford,* 363 Pa. 153, 156, 69 A.2d 114, 116 (1949). There is "no liability on the part of a municipal corporation for the flooding of private property from the inadequacy of gutters, drains, culverts, or sewers" *as long as the municipality has not diverted water from its natural flow. Torrey v. City of Scranton,* 133 Pa. 173, 19 A. 351 (1890).

■ The case *sub judice* does not involve the artificial diversion of surface waters. The evidence shows that the flooding that occurred on Snap–Tite's property was a result of the natural flow of water through the watershed accumulating on the southern side of the railroad tracks that acted like a dam during heavy rainfall. According to Steven Halmi, the natural flow of the water in the Township is from south to north, toward the railroad tracks. (Tr. Day 1 at 167–68). He stated that "[r]egardless of where the water comes from, if there is insufficient capacity of the culverts to convey it across the tracks, it would pond." (*Id.* at 168). This would be true if there were no storm sewers anywhere in the vicinity. (*Id.* at 169). Thus, according to expert testimony, nearly all of the rainwater that fell during the two storms and flowed onto Snap–Tite's property would eventually have arrived there at some point even if the Township had not established a storm water management system. Snap–Tite provided no evidence otherwise; it failed to identify any Township project which: altered the direction of storm water flows; altered drainage courses north or south of the parcel; altered grades/elevations; unreasonably or unnecessarily increased the rate at which the storm water run-off was discharged; or directed storm water onto the property that would not have otherwise flowed onto it.[9] Thus, Snap–Tite could not show that it was Township action that caused flooding to occur on Snap–Tite's property. (Tr. Day 1 at, *e.g.,* 30, 43, 57, 63–65, 67–68).

■ Further, to constitute a *de facto* taking, the overflow must become an "actual, permanent invasion of the land

---

**9.** The only Township project in the vicinity of the Snap–Tite property was completed in June, *1978.* The Township enclosed an existing drainage ditch leading north from West 22nd Street with elliptical storm sewer piping. The Township states this pipe "alter[ed] neither the direction or volume of flow of storm water leading to natural drainage courses on railroad-owned property." (Motion for Entry of Judgment Dismissing Petition for Appointment of Viewers, p. 2, ¶ 7). Furthermore, "[e]ven if Petitioners had cited this project as an act giving rise to their claim (and they have not), the project occurred over 22 years prior to filing of Petitioners' petition such as to be beyond any applicable limitations period." (*Id.,* no. 8).

amounting to an appropriation thereof, and not merely an injury to the property." *Oxford v. Department of Transportation,* 96 Pa.Cmwlth. 68, 506 A.2d 990, 994 (1986); *see also Sanguinetti v. United States,* 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608 (1924). Here, there were no such exceptional circumstances; the flooding of Snap–Tite's property was sporadic and was not shown to be a direct or necessary consequence of any Township actions. In addition, Snap–Tite provided no evidence that its land had substantially changed in character or that its customary use was prevented, except for short periods of time, years apart.

Snap–Tite also cannot claim damages for a *de facto* taking which, if it happened at all, occurred prior to the time it became the owner of the property. *Florek v. Department of Transportation,* 89 Pa. Cmwlth. 483, 493 A.2d 133, 136 (1985) (*citing Synes Appeal,* 401 Pa. 387, 164 A.2d 221 (1960)) (where optionee, at time of condemnation, had not exercised his right to purchase, and equitable title remained in vendor, optionee was not entitled to condemnation award). None of the experts had knowledge of *who* built the sewers and catch basins in the Township or *when.* (*Id.* at 140). Mr. Halmi could not "identify any storm water conveyance facility in the part of the Marshall Run watershed that flows generally toward the MRR3 culvert that has been constructed *since* the Township storm water management ordinance was put into place, which would be 1997." (Tr. Day 1 at 165–66).[10] In fact, Mr. Morris, the Township engineer, testified that the most recent building permit issued by the Township for the drainage area for Snap–Tite's parcel was dated December, 1994. (*Id.* at 199).[11]

Thus, because Snap–Tite has failed to aver facts sufficient to demonstrate a *de facto* taking, and has failed to show that exceptional circumstances have deprived it of its use and enjoyment of its property, the Township cannot be held to have effectuated a taking of Snap–Tite's property.

Accordingly, we affirm the order of the trial court.

### *ORDER*

**NOW,** December 3, 2002, the order of the Court of Common Pleas of Erie County in the above-captioned matter is hereby affirmed.

---

10. The Commonwealth of Pennsylvania adopted the Storm Water Management Act and signed it into law in 1978. (Tr. Day 2 at 43). According to David Skellie, Erie County Planning Director for 21 years, this Act required county governments to adopt storm water management plans, which Erie County did in phases: Phase I was adopted in June 1991; Phase II was adopted in June 1996. (*Id.* at 45). That plan was approved by the Pennsylvania Department of Environmental Protection. (*Id.*) The state then sent letters to the 25 municipalities existing within the Lake Erie watershed at that time, "requiring that they adopt a storm water management ordinance." (*Id.*) Millcreek Township had adopted a storm water management plan before the county did (1990) and thus amended its previous ordinance on February 27, 1997 in order to come into compliance with the county plan. (*Id.* at 46–47). Steven Halmi stated that if Snap–Tite was built today on the same property, the owners would have to comply with the presently existing regulations in the storm water management ordinance. (Tr. Day 1 at 161).

11. Previous permits were issued from the early 1950s until December 1994.