# Sienkiewicz v. PennDOT

450

C.P. of Lackawanna County, no. 02 CV 1143.

*Edwin A. Abrahamsen,* for plaintiff.
*John V. Rovinsky,* for the Commonwealth.

NEALON, *J.,* May 2, 2003—The Commonwealth of Pennsylvania, Department of Transportation has submitted preliminary objections to the amended petition for appointment of a board of viewers filed by plaintiff Richard Sienkiewicz Jr. t/d/b/a Montage Mini-Mart Inc. alleging a de facto condemnation of property by PennDOT. The competent and credible evidence establishes that PennDOT has effectively denied a reasonable and safe

means of access to Sienkiewicz' property for tractor-trailers, buses and large trucks which formerly comprised a considerable portion of Sienkiewicz' business. Since PennDOT's permanent interference with Sienkiewicz' right of reasonable access to his property caused him to close his business, it constitutes a de facto condemnation under the Eminent Domain Code and PennDOT's preliminary objections will be denied.

## I. PROCEDURAL HISTORY

On February 28, 2002, Sienkiewicz filed a petition for appointment of a board of viewers pursuant to section 502(e) of the Eminent Domain Code, Act of June 27, 1964, special sess., P.L. 84, as amended, 26 P.S. §1-502(e), to determine compensable damages allegedly sustained by him as a result of PennDOT's de facto condemnation of his property at 2801 Stafford Avenue, Moosic. In response to preliminary objections that were presented by PennDOT, Sienkiewicz filed an amended petition under sections 502(e) and 612 of the Code on May 23, 2002, and PennDOT resubmitted its preliminary objections on June 5, 2002. (See docket entry nos. 1-2, 4, 7-8.) After the parties filed their respective briefs, oral argument on PennDOT's preliminary objections was conducted before Judge Michael J. Barrasse on September 17, 2002, at which time Judge Barrasse "instructed counsel for both parties to conduct the depositions of representatives of both parties as well as any witnesses in lieu of presenting such testimony at a hearing." (See plaintiff's brief, p. 3.)

Sienkiewicz and PennDOT conducted depositions of several engineers, PennDOT representatives and other witnesses, and after the parties filed six deposition tran-

scripts and accompanying exhibits of record, they requested that the preliminary objections be decided based upon the evidentiary record submitted. (Dkt. entry nos. 12-17, 19.) By notice dated December 31, 2002, this matter was reassigned to the undersigned for disposition and oral argument was scheduled for March 6, 2003. On that date, a supplemental affidavit of Richard E. Sienkiewicz Jr. was filed without objection, and following the presentation of oral argument, this matter was submitted for a decision.

## II. FACTUAL FINDINGS

(1) On November 8, 1993, Sienkiewicz acquired a 20,643 sq. ft. parcel of land which is located at 2801 Stafford Avenue from Anthony J. and Barbara A. Rinaldi for the purchase price of $200,000. (See defendant's exhibit no. 8, deed book 1453, pp. 274-77.)

(2) Sienkiewicz' property is situated near the intersection of Davis Street and Stafford Avenue in the vicinity of the Davis Street exit ramp for southbound traffic traveling on Interstate Route 81. (See defendant's exhibits nos. 2-4, 7.)

(3) Prior to PennDOT's reconfiguration of the Davis Street Interchange, Sienkiewicz operated an interstate convenience store on his property which sold gasoline, diesel fuel and convenience items primarily to Route 81 motorists. (See dkt. entry no. 13, pp. 7-8.)

(4) Sienkiewicz' property (PennDOT's parcel 26) is situated adjacent to land (PennDOT's parcel 24) owned by Andrew G. Zubert upon which a competing gas station and mini-mart is located. The Sienkiewicz and Zubert properties are bisected by a strip of realty (PennDOT's

parcel 25) that is allegedly owned by Anthony J. Rinaldi and which has functioned as an extension of Stafford Avenue to Davis Street. (Dkt. entry no. 12, pp. 21-24; defendant's exhibit no. 2.)

(5) The bisecting strip of roadway, which has been described by the litigants and their representatives as "Old Stafford Avenue," provided a means by which Davis Street traffic could enter Stafford Avenue and vice-versa and, in the process, access the Sienkiewicz and Zubert gas stations and convenience stores. (*Id.*, pp. 25-26.)

(6) Rinaldi and Jerry Warsky allegedly acquired title to this strip of roadway by way of a deed from John R. Muldowney dated April 12, 1984. (Defendant's exhibit 8, deed book 1106, pp. 542-44.) On March 17, 1989, Jerry Warsky conveyed certain property to Rinaldi (including that realty which was subsequently purchased by Sienkiewicz on November 8, 1993) for $20,000 via a deed that contained the following clause:

" It is the intention of this conveyance to also include, by way of a quit claim, any remaining land described in parcel 2 of [the] deed between John R. Muldowney, agent, to Anthony J. Rinaldi and Jerry Warsky, dated April 12, 1984 and recorded in Lackawanna County Deed Book 1106, at page 542, . . ., it being understood that said Anthony J. Rinaldi and Jerry Warsky *may* own a small strip of land along the northeasterly side of Stafford Avenue having a depth of approximately 1' to 3' and having a length that has not been accurately determined with the said Jerry Warsky and Frances Warsky conveying, by quit claim, any and all right, title and interest they may have in and to said small strip of land." (Defendant's exhibit 10, deed book 1281, pp. 42-45.) (emphasis added)

The Rinaldi-Sienkiewicz conveyance dated November 8, 1993, includes a provision which states: "It is the intention of this conveyance *not* to include any remaining land described in the deed between Jerry Warsky and Frances R. Warsky, his wife, to Anthony J. Rinaldi, dated March 17, 1989 and recorded in the Office of the Recorder of Deeds in and for Lackawanna County in deed book 1281 at page 42, it being understood that Anthony J. Rinaldi will retain a small strip of land along the northeasterly side of Stafford Avenue." (Defendant's exhibit 9, deed book 1453, p. 274.) (emphasis in original)

(7) The bisecting strip of land allegedly owned by Rinaldi and identified by the parties as "Old Stafford Avenue" has never been formally dedicated to or accepted by the City of Scranton or the Borough of Moosic as a public roadway. (Dkt. entry no. 12, pp. 29-30, 57-58; dkt. entry no. 17, pp. 12, 19.)

(8) However, PennDOT maps and records from 1965, 1973 and 1983 clearly identify the bisecting strip of land in question (Old Stafford Avenue) as a public road rather than privately owned property. (Dkt. entry no. 14, pp. 19-21, 23-24, 36-38, 51-53, 96, 105-106.)

(9) The general public has continuously used Old Stafford Avenue as a means of ingress to and egress from Davis Street for more than 21 years and the bisecting strip of land has been openly used as a public road during that time period. PennDOT's own project manager for the Davis Street Interchange construction attested that Old Stafford Avenue has been used as a public road "[f]or all types of public traffic" for more than 25 years. (Dkt. entry no. 12, pp. 66-67.) PennDOT's district permit engineer likewise referred to the disputed strip of land as "Old Stafford Avenue," not Rinaldi's privately owned

property, during his deposition testimony. (Dkt. entry no. 16, pp. 13-14.)

(10) Maintenance of Old Stafford Avenue has been provided by the City of Scranton when necessary, and according to the former director of Public Works for the City of Scranton, the city has treated Old Stafford Avenue "no differently than a dedicated public right-of-way" and has performed "pothole patching" and "snow removal" on that road and has received monetary payments from utilities for pave cut permits relative to Old Stafford Avenue. (Dkt. entry no. 12, pp. 59-60; dkt. entry no. 15, p. 51.)

(11) Prior to the commencement of PennDOT's construction to reconfigure the Davis Street exit, Sienkiewicz had "open access along" the Stafford Avenue side of his property and motorists exiting Route 81 via the Davis Street exit would access Sienkiewicz' business by making a right hand turn onto Davis Street, proceeding northwest on Davis Street for approximately 120 feet, turning right onto "Old Stafford Avenue" which bisected the Sienkiewicz and Zubert properties, and entering Sienkiewicz' gas station/mini-mart property from Stafford Avenue. (Dkt. entry no. 12, pp. 21-22, 25-26.)

(12) Traffic traveling on Old Stafford Avenue was controlled by a posted stop sign at the intersection of Old Stafford Avenue and Davis Street. Therefore, motorists leaving the Sienkiewicz or Zubert properties by way of Old Stafford Avenue were required to stop at a posted stop sign on Old Stafford Avenue before entering Davis Street. (Dkt. entry no. 15, pp. 18-19.)

(13) According to PennDOT, the pre-construction daily flow of traffic in the area of Sienkiewicz' property was:

(a) Stafford Avenue—4,753 motorists; (b) Davis Street—16,569 motorists; and (c) Davis Street exit ramp from Route 81—7,597 motorists. (Dkt. entry no. 15, pp. 35-37.)

(14) Because of the marked increase in commercial and residential development on Montage Mountain and the concomitant rise in the volume of traffic at the Davis Street exit, PennDOT decided to reconfigure the Davis Street Interchange from a "diamond" design to higher capacity "loop" ramps to alleviate traffic congestion and accommodate the increasing number of motorists. To accomplish the new design, PennDOT relocated the intersection of Davis Street and Stafford Avenue in the vicinity of Sienkiewicz' property by moving that intersection 230 feet northwest so as to create three separate intersections situated more than 1,000 feet apart that are controlled by traffic lights. (Dkt. entry no. 12, pp. 16-20; dkt. entry no. 15, pp. 9-14, 20-22.)

(15) Under the newly designed interchange, Sienkiewicz' property and business are no longer situated at the intersection of Davis Street and Old Stafford Avenue. Under the new configuration, southbound traffic exiting Route 81 via the Davis Street exit can no longer access Sienkiewicz' property directly by way of Old Stafford Avenue. Rather, such traffic must drive past Sienkiewicz' property and proceed 350 feet northwest to the new intersection of Davis Street and Stafford Avenue, turn right onto Stafford Avenue, drive past Zubert's gas station and mini-mart property and travel a circuitous route of 900 feet to arrive at Sienkiewicz' property. (Dkt. entry no. 12, pp. 33-34, 78-79; dkt. entry no. 14, pp. 30-36, 42-51, 132, exhibits 8-10; dkt. entry no. 15, pp. 40-42.)

(16) With regard to Sienkiewicz' access by way of Old Stafford Avenue, PennDOT converted that strip of roadway from a public road to privately owned property by paying Rinaldi $100,000 for .47 acres of a right-of-way that PennDOT condemned on Old Stafford Avenue, narrowing Old Stafford Avenue's width from 45 feet to 24 feet, and declaring the remainder to be owned by Rinaldi. (Dkt. entry no. 12, pp. 51-52, 73-76; dkt. entry no. 14, pp. 42-48, 104; dkt. entry no. 17, pp. 18-19, defendant's exhibit no. 16.) The physical dimensions of Old Stafford Avenue are no longer adequate to accommodate large trucks, tractor-trailers, motor homes, tour buses and large postal trucks which formerly patronized Sienkiewicz' business and, more importantly, Rinaldi can now deny Sienkiewicz and his customers access to Sienkiewicz' property via the Old Stafford Avenue since it has been converted to private property by PennDOT. (Dkt. entry no. 12, p. 76; dkt. entry no. 14, pp. 60-63; dkt. entry no. 17, pp. 20-22, 26.) As a consequence, neither Sienkiewicz nor his patrons can use the land formerly known as Old Stafford Avenue to gain entry to the Sienkiewicz property. (Dkt. entry no. 12, pp. 36, 73-76.)

(17) With regard to the easterly means of access to Sienkiewicz' property from the original Stafford Avenue (*i.e.,* that portion of the public roadway that does not include Old Stafford Avenue), PennDOT has changed Sienkiewicz' ingress and egress from "wide open" uncurbed access comprised of 91 foot and 62 foot wide throats along Stafford Avenue to two 40-foot-wide drop-curb openings carved out of eight-inch high curbing along Stafford Avenue. (Dkt. entry no. 12, pp. 30-31; dkt. entry no. 14, pp. 63-76, exhibits 13-15; dkt. entry no. 16, pp. 15, 22.) According to the American Association of

State Highway and Transportation Officials (AASHTO) standards governing Geometry for Highways and Streets, 40-foot-wide drop-curb openings are not reasonably safe means of access for 65-foot tractor-trailers and comparably large buses, motor homes and trucks which would be forced to traverse eight-inch high curbing and possibly "blow a tire" in attempting to access Sienkiewicz' property via the easterly Stafford Avenue side of that land. (Dkt. entry. no. 13, pp. 22-25, 35; dkt. entry no. 14, pp. 60-76, 78-79, exhibits 13-15.)

(18) The traffic volume projections which have been calculated by PennDOT's engineering consultants reflect that the newly configured Davis Street Interchange results in a daily decrease of 1,222 trucks and tractor-trailers which will exit Route 81 and pass by Sienkiewicz' place of business. (Dkt. entry no. 14, pp. 54-57, exhibit no. 10.)

(19) Sienkiewicz has experienced a dramatic reduction in gasoline and convenience items sales since the Davis Street exit ramps and the Stafford Avenue accessways were reconstructed in December 2002. By way of illustration, Sienkiewicz' regular gas volumes in December 2002 and January 2003 were 44,103 gallons and 41,499 gallons respectively compared to 75,711 gallons in November 2002, 71,259 gallons in December 2001 and 68,914 gallons in January 2002. Even after factoring in an artificial elevation in sundry sales due to purchases made by construction employees and motorists working at the Davis Street Interchange project, Sienkiewicz suffered a comparable reduction in convenience item sales and revenues. (Dkt. entry no. 13, pp. 13-17, 20-22, 27, exhibit nos. 1 and 4.) Sienkiewicz' decrease in gasoline and convenience items sales and

revenues are largely attributable to the fact that tractor-trailers, motor homes, tour buses, and large trucks can no longer access his property by way of Stafford Avenue. (*Id.,* pp. 22-25, 35.)

(20) As a result of the continuing decline in sales at Sienkiewicz' gasoline station and mini-mart, Sienkiewicz was forced to cease business operations completely on March 4, 2003. (Dkt. entry no. 19, ¶5.)

## III. DISCUSSION

### (A) *Standard of Review*

Preliminary objections in eminent domain proceedings serve a different purpose than those filed under the Rules of Civil Procedure and are intended as a mechanism to resolve expeditiously the factual and legal challenges regarding a taking before the parties proceed to determine damages. *In re Condemnation by South Whitehall Township,* 2002 WL 32082246, *1 n.3 (Pa. Commw. 2003); *In re Condemnation by City of Coatesville,* 2002 WL 32071670, *2 (Pa. Commw. 2003). Therefore, preliminary objections are the exclusive method under the Eminent Domain Code for raising objections to a petition for the appointment of viewers asserting a de facto taking or inverse condemnation. *Genter v. Blair County Convention and Sports Facilities Authority,* 805 A.2d 51, 54 n.6 (Pa. Commw. 2002); *McGaffic v. Redevelopment Authority of City of Newcastle,* 732 A.2d 663, 666 n.1 (Pa. Commw. 1999), *appeal denied,* 561 Pa. 633, 747 A.2d 903 (1999). When considering preliminary objections to a petition alleging a de facto taking, the court "must determine first whether, as a matter of law, the averments of the petition for the appointment

of viewers, taken as true, in addition to any stipulated facts, are sufficient to state a cause of action for a de facto taking." *Snap-Tite Inc. v. Millcreek Township,* 811 A.2d 1101, 1105 n.8 (Pa. Commw. 2002); *In re Condemnation by City of Scranton (Milewski),* 102 Lacka. Jur. 409, 413 (2001). If the petition fails to allege a viable cause of action, the preliminary objections must be sustained and the petition dismissed or the petitioner allowed to amend the pleading. *Millcreek Township v. NEA Cross Co.,* 152 Pa. Commw. 576, 580, 620 A.2d 558, 560 (1993), *appeal denied,* 537 Pa. 655, 644 A.2d 739 (1994); *In re Condemnation by Commonwealth of Pennsylvania (Zipay I),* no. 99 CV 4028, Nealon, J. at pp. 3-4 (Lacka. Cty. March 9, 2000).

However, "[i]f the averments, taken as true *might* establish a de facto taking, the trial court must take evidence by depositions, or otherwise, *so that a judicial determination might be made." Snap-Tite Inc.,* 811 A.2d at 1105 n.8. (emphasis in original) Similarly, "if the preliminary objections raise an issue of fact, the resolution of which is necessary for determining whether a de facto taking has occurred, the court must hold an evidentiary hearing." *In re Commonwealth Department of General Services,* 714 A.2d 1159, 1162 (Pa. Commw. 1998); *Milewski, supra.* If the court receives evidence by deposition or hearing, the trial judge as "[t]he fact-finder must resolve evidentiary conflicts" and "the trial court's findings will not be disturbed if supported by substantial evidence." *Snap-Tite Inc.,* 811 A.2d at 1105.

PennDOT apparently conceded that Sienkiewicz' petition raised an issue of fact regarding a de facto condemnation since it did not ask Judge Barrasse to make a preliminary determination with respect to the sufficiency

of Sienkiewicz' averments. Compare *Zipay I, supra.* Even if such a challenge to the amended pleading had been lodged by PennDOT, Sienkiewicz' allegations would nonetheless warrant an evidentiary hearing inasmuch as they assert that PennDOT's redesign and construction of the Davis Street Interchange "prohibit access to [Sienkiewicz'] property located at 2801 Stafford Avenue" and the accompanying change in the grade of the road has caused "a permanent interference with access to" Sienkiewicz' property. (See plaintiff's amended petition, ¶¶7, 13.) PennDOT's preliminary objections likewise raise factual issues concerning the purported de facto condemnation, and as such, also necessitated an evidentiary hearing.

As the party asserting an inverse condemnation, Sienkiewicz bears the burden of proving that a de facto taking has in fact occurred. The Supreme Court of Pennsylvania has observed that a landowner bears a "heavy burden" to establish such a taking by demonstrating that the entity clothed with the power of eminent domain has substantially deprived an owner of the beneficial use and enjoyment of property. *Miller & Son Paving Inc. v. Plumstead Township,* 552 Pa. 652, 656, 717 A.2d 483, 485 (1998), *cert. denied,* 525 U.S. 1121 (1999). However, the property owner need not establish a de facto condemnation by "clear and formidable evidence" and is only required to prove such a taking by a "fair preponderance of the credible testimony." *Petition of Ramsey,* 31 Pa. Commw. 182, 188, 375 A.2d 886, 889 (1977) (quoting *Lizza v. Uniontown City,* 345 Pa. 363, 365, 28 A.2d 916, 918 (1942)); *In re Condemnation by Commonwealth of Pennsylvania (Zipay II),* no. 99 CV 4028, Nealon, J., at p. 5 (Lacka. Cty. April 14, 2000). "There is

no bright line test to determine when government action shall be deemed a de facto taking", *Newman v. PennDOT,* 791 A.2d 1287, 1289 (Pa. Commw. 2002), and "each case turns on its unique factual matrix." *Genter,* 805 A.2d at 56; *Milewski,* 102 Lacka. Jur. at 415.

## (B) *Right of Reasonable Access*

Every property owner has a right of access to his or her property from a public roadway and that right of access has been defined as reasonable ingress and egress to the property and abutting highway. *Commonwealth v. Hession Condemnation Case,* 430 Pa. 273, 277, 242 A.2d 432, 434 (1968), *cert. denied,* 393 U.S. 1049 (1969); *Newman,* 791 A.2d at 1289. The right of access to and from a public roadway is considered a constitutionally protected right which cannot be deprived by the government without just compensation. *Wolf v. Commonwealth Department of Highways,* 422 Pa. 34, 39, 220 A.2d 868, 871 (1966). In that regard, section 612 of the Eminent Domain Code states that "[a]ll condemnors, including the Commonwealth of Pennsylvania, shall be liable for damages to property abutting the area of an improvement resulting from . . . permanent interference with access thereto, . . . whether or not any property is taken." 26 P.S. §1-612.

Although the "right of access does not entitle the abutting owner to access at all points along the highway," a condemning authority is liable for damages if it "permanently interferes with an owner's access to the property by reasonable and conventional means." *Jackson Gear Co. v. PennDOT,* 657 A.2d 1370, 1371 (Pa. Commw. 1995). Accord *Fortney v. Bell Telephone of Pennsylvania,* 267 Pa. Super. 576, 579-80, 407 A.2d 391, 393

(1979), *appeal dismissed,* 492 Pa. 265, 424 A.2d 500 (1981). "Reasonable access to one's property is a question of fact to be determined by the trial court." *Elser v. PennDOT,* 651 A.2d 567, 570 (Pa. Commw. 1994) (en banc), *appeal denied,* 540 Pa. 650, 659 A.2d 988 (1995). If alternative access to the property exists, it must enable the property to be used for the purpose for which it previously had been employed in order to be considered a reasonable means of entry. See *Commonwealth v. Appointment of Viewers (McCrady),* 399 Pa. 586, 595-96, 160 A.2d 715, 720-21 (1960); *Milewski, supra* ("[w]hether a particular activity deprives a property owner of the beneficial use and enjoinment of land is dependent upon the type of use the owner has given to the property."). Cf. *Condemnation by PennDOT (Contakos),* 93 Pa. Commw. 403, 409, 501 A.2d 1171, 1175 (1985) (where a partial taking interferes with suitable access, rendering it unsuited for its present use or for its highest and best use, this may be considered in determining fair market value of the remainder).

Sienkiewicz' argument regarding PennDOT's purported denial of reasonable access to his property is essentially two-fold. First, Sienkiewicz contends that by requiring westbound traffic on Davis Street to travel past his gas station, to a traffic light and past his competitor's station before accessing Sienkiewicz' property, PennDOT has created an overly circuitous detour which represents an unreasonable permanent interference with access. Second, Sienkiewicz maintains that PennDOT's narrowing of the channels of ingress and egress to Stafford Avenue prevent gasoline tankers, tractor-trailers and larger trucks from entering or exiting the property without traversing over the eight-inch curbs and creating a hazard.

According to Sienkiewicz, he has been forced to close his business since his diesel fuel customers have been denied reasonable and safe access to his property, thereby resulting in a de facto condemnation.

### (C) *"Old" Stafford Avenue Ownership*

Before considering the merits of Sienkiewicz' arguments, a threshold determination must be made regarding the ownership of "Old Stafford Avenue" which bisected the properties owned by Sienkiewicz and Zubert. PennDOT contends that this particular strip of roadway has always been privately owned by Anthony J. Rinaldi such that Sienkiewicz has never had any constitutionally protected right of access via that private road. Sienkiewicz counters that although the roadway may have been owned by Rinaldi's and Warsky's predecessor-in-title at one time, it was converted into a public roadway under the "public user" doctrine and became an extension of Stafford Avenue. If "Old Stafford Avenue" was a public road, PennDOT cannot permanently interfere with Sienkiewicz' right of reasonable access to and from that road without just compensation.

Under Pennsylvania law, there are three methods by which the existence of a public road may be established: (1) through the introduction of court records showing the road to have been opened under the Act of June 13, 1836, P.L. 551, 36 P.S. §1781 et seq.; (2) by demonstrating the requisite public use and municipal maintenance under the Second Class Township Code; or (3) by prescription which requires uniform, adverse, continuous use of the road under claim of right by the public for 21 years. *Stewart v. Watkins,* 427 Pa. 557, 558-59, 235 A.2d

604, 605 (1967); *Lagler v. Upper Milford Township Zoning Hearing Board,* 67 Pa. Commw. 200, 202, 446 A.2d 712, 713 (1982). It is undisputed that the strip of land in question has never been formally dedicated to or accepted by the City of Scranton or the Borough of Moosic, and as such, the first method of establishing a public road is inapplicable.

With respect to the second alternative, section 2307 of the Second Class Township Code provides that: "[e]very road which has been used for public travel and maintained and kept in repair by the township for a period of at least 21 years is a public road having a right-of-way of 33 feet even though there is no public record of the laying out or dedication for public use of the road."[1] 53 P.S. §67307. Under this statute, the existence of a public road may be established by (1) public travel on the road for 21 years, and (2) municipal maintenance of the road for 21 years. *Stewart, supra* at 559, 235 A.2d at 606; *Morgan v. Richter,* 724 A.2d 983, 986 (Pa. Commw. 1999). In *Stewart,* a public roadway was adequately proven by a landowner who introduced decades old maps "showing the road as a township road" and testimony of snowplowing some 10 years earlier. *Stewart, supra* at 560, 235 A.2d at 606 (holding that "[w]hile this [plowing 10 years earlier] is not 21 years, several persons testified that repairs were made when necessary").

---

1. At the time of the *Stewart* decision in 1967, the above-quoted provision was found in section 1105 of the Second Class Township Code, Act of May 1, 1933, P.L. 104, 53 P.S. §66105 (repealed). That statute was amended by the Act of November 9, 1995, P.L. 350, no. 60, which codified the relevant language of section 1105 into 53 P.S. §67307.

As to the third option, "[e]stablishment by prescription is composed of two main elements: adverse and continuous public use and such use for a period of at least 21 years." *SEPTA v. Pennsylvania Public Utility Commission,* 95 Pa. Commw. 341, 345, 505 A.2d 1046, 1048 (1986). Accord *Morgan,* 724 A.2d at 987 ("In order to merit a declaration that a road is public by means of common-law prescription, one must show that the public used the road uniformly, adversely and continuously under a claim of right for 21 years."). The evidence need not show a constant use in order to prove continuity; rather, continuity is demonstrated by a settled course of conduct indicating "an attitude of mind on the part of the user or users that the use is the exercise of a property right." *Keefer v. Jones,* 467 Pa. 544, 548, 359 A.2d 735, 737 (1976). However, the use must be by the general public as opposed to a limited segment of the public, and "[a]lthough public use does not mean use by every member of the local community, the legal concept nevertheless requires evidence of continuous use sufficient to constitute a benefit to the local community as a whole." *SEPTA, supra,* 95 Pa. Commw. at 348, 505 A.2d at 1049.

The competent and credible evidence in the record establishes the existence of "Old Stafford Avenue" as a public roadway under either of the latter two options. PennDOT's own project engineer testified that the parcel in question was used by the general public as a means of travel for more than 21 years. Documents submitted by PennDOT also demonstrate maintenance of the road by the City of Scranton as evidenced by its snow removal, blacktopping and receipt of utility payments for pave cut permits. Although this documentary evidence does not specifically confirm the details of city maintenance for

more than 21 years, the record reflects that maintenance was performed when needed and there is no indication in the record to the contrary. See *Stewart,* 427 Pa. at 560, 235 A.2d at 606.

Furthermore, there is substantial evidence in the reproduced record of the establishment of a public roadway by prescription. Old Stafford Avenue was continuously, adversely and openly used by the general public for access to and from Davis Street for a period in excess of 21 years. As such, it was transformed into a public roadway and Sienkiewicz possessed a right of reasonable ingress to and egress from it. Having concluded that Old Stafford Avenue was a public road prior to the commencement of PennDOT's construction of the new Davis Street Interchange, we will consider the merits of Sienkiewicz' assertions of a de facto condemnation.

### (D) *Circuitous Access*

PennDOT's construction and reconfiguration of the Davis Street Interchange will now require westbound Davis Street traffic to travel approximately 350 feet to a traffic light in order to turn right onto Stafford Avenue and proceed past his competitor, Zubert, to gain entry to Sienkiewicz' property. Motorists must travel a total distance of 750-900 feet from the Davis Street exit to access the Stafford Avenue entrance to Sienkiewicz' gas station and mini-mart. Sienkiewicz asserts that this 750-900-foot detour past Zubert's property is so circuitous as to constitute a permanent unreasonable interference with his right of reasonable access. (See plaintiff's brief, pp. 15-17.) See also, Montague, *The Circuitous Route Taken to Deny Property Owners Damages in Ac-*

*cess Cases: "Where Has All The Fairness Gone?"*, 32 Urb. Law. 523 (Summer 2000).

Our appellate courts have recognized "that a detour might be so long and circuitous as to represent an unreasonable permanent interference with access." *Jackson Gear Co.*, 657 A.2d at 1371. The Supreme Court has cautioned, however, that "[o]ur cases are legion that, where the result of a condemnor's action is to compel the allegedly affected property owner to travel a short distance farther to reach the system of streets going in a specific direction, this slight inconvenience is not compensable." *Hession*, 430 Pa. at 278, 242 A.2d at 434. Subsequent decisional precedent has established that circuitous detours of more than several miles may constitute compensable deprivation of reasonable access whereas less onerous routes generally have been regarded as noncompensable inconveniences. Compare *Jackson Gear Co., supra* (detour of between 6 and 11.5 miles required by erection of medial barriers represented permanent unreasonable interference with right of access); *PennDOT v. Guyette*, 103 Pa. Commw. 402, 405-406, 520 A.2d 548, 549-50 (1987) (requiring 18-wheel trucks to travel an additional 7.45 miles in order to enter a commercial property held to be compensable under code), *appeal denied*, 516 Pa. 644, 533 A.2d 714 (1987) and *Appeal of PennDOT*, 164 Pa. Commw. 81, 87-88, 644 A.2d 1274, 1277 (1994) (1.3 mile detour required by barrier was not so circuitous as to be a substantial or unreasonable interference with access), *appeal denied*, 540 Pa. 605, 655 A.2d 993 (1995); *Washington Blvd. v. PennDOT*, 34 Pa. Commw. 356, 360-61, 383 A.2d 1289, 1291 (1978) (circuitous travel covering 2.8 miles found

not to be so unreasonable as to constitute a taking under 26 P.S. §1-612).

The degree of circuity at issue in this litigation is far less burdensome than those detours which have been declared reasonable by the courts. The total distance which now must be traveled by motorists departing the Davis Street exit with the intention of patronizing Sienkiewicz' business is less than 1,000 feet. Since detours of 1.3 miles and 2.8 miles have been determined to be noncompensable under section 612 of the code, the detour in the case sub judice cannot be considered an unreasonable permanent interference with access.

Sienkiewicz submits that although the length of the detour may be minimal, the new traffic patterns designed by PennDOT on Davis Street have greatly reduced the number of interstate motorists who patronize his commercial property since they must now pass Zubert's gas station and mini-mart before arriving at Sienkiewicz' business. While this reconfiguration may have decreased the volume of passing motorists, the Supreme Court has long recognized "that owners of properties abutting state roads have no cognizable legal interest in preserving a particular flow of traffic on those roads." *Carlino v. Whitpain Investors,* 499 Pa. 498, 502, 453 A.2d 1385, 1387 (1982); *Hession,* 430 Pa. at 281, 242 A.2d at 436 ("no compensable right exists in any given traffic pattern; having no right to the continuation of the existing traffic pattern, [landowners] may not demand compensation for a change in that pattern."). Indeed, in its seminal holding in *Wolf,* the court squarely addressed the argument currently being advanced by Sienkiewicz and held:

"Nor does the right of ingress or egress to or from one's property include any right in and to the existing public traffic on the highway, or any right to have such traffic pass by one's abutting property. The reason is that all traffic on public highways is controlled by the police power of the state, and what the police power may give an abutting property owner in the way of traffic on the highway it may take away, and by any such diversion of traffic the state and any of its agencies are not liable for any decrease of property values by reason of such diversion of traffic, because such damages are 'damnum absque injuria,' or damage without legal injury." *Wolf,* 422 Pa. at 47, 220 A.2d at 875 (quoting *State of Missouri v. Meier,* 388 S.W.2d 855, 857 (1965)).

Although *Wolf* was decided prior to the enactment of the Eminent Domain Code in 1964, the legal principles articulated therein remain controlling. See *Appeal of PennDOT,* 164 Pa. Commw. at 86 n.7, 644 A.2d at 1276 n.7. Because a landowner does not have "a property right in the traffic which flows by his door," *Hession,* 430 Pa. at 282, 242 A.2d at 436, the diversion of traffic from Davis Street to Stafford Avenue by way of a somewhat circuitous route is not tantamount to a compensable de facto condemnation. See *In re Condemnation by Delaware River Port Authority,* 667 A.2d 766, 768-69 (Pa. Commw. 1995); *Appeal of PennDOT,* 164 Pa. Commw. at 83-86, 644 A.2d at 1275-76 (reversing lower court finding of a de facto taking even though the business owner had "established that potential customers of petitioner's used car lot-related businesses no longer stop and patronize petitioner and/or are, by the detour, being funneled to petitioner's competitor."). Consequently, Sienkiewicz cannot prove a compensable taking under

section 612 as a result of the re-routing of traffic from Davis Street to Stafford Avenue.

## (E) *Stafford Avenue Ingress and Egress*

Relying on *McCrady, supra,* Sienkiewicz alternatively argues that PennDOT's actions in narrowing his 90-foot-wide and 60-foot-wide entry and exit ramps on Stafford Avenue to two 40-foot-wide dropped-curb openings prevent gasoline tankers, tractor-trailers, buses and large trucks from accessing his property without dangerously crossing eight-inch curbing. Sienkiewicz maintains that this lack of reasonable access from Stafford Avenue has resulted in a dramatic decline in tractor-trailer, bus and large truck business which previously constituted a considerable portion of his diesel fuel and mini-mart revenue. It is undisputed that Sienkiewicz' monthly gasoline and convenience items sales declined dramatically after the marked narrowing of the Stafford Avenue accessways, thereby compelling him to close his business completely on March 4, 2003. PennDOT counters that since *McCrady* was a pre-Eminent Domain Code holding, its legal analysis is inapplicable to this case.

In *McCrady,* PennDOT devised a construction plan concerning a highway which bordered a landowner's commercial property that contained a gasoline station and restaurant. Under PennDOT's plan, "five accessways, 36 feet in width, were provided as means of ingress and egress to the gasoline station, the restaurant and the parking area." *McCrady,* 399 Pa. at 589, 160 A.2d at 717. Not unlike the Stafford Avenue access ramps in the case at bar:

"[t]hese accessways were located in such position that ingress and egress to and from the gasoline station, the

restaurant and parking area were rendered exceedingly difficult and, in some instances, impossible. *The narrow width of the accessways prevented the entry of large trucks and truck-trailers — representative of a considerable volume of the business of the gasoline station — unless* such trucks or truck-trailers first turned to the left into the most southerly lane of the westbound two lane route no. 5 or *drove over the almost insurmountable curbing.* Socony Mobile Oil Co., [the landowner's] lessee of the gasoline station, notified [the landowner] it would have to surrender its lease because of the fact that *the construction of the curbing and accessways made unprofitable the operation of the gasoline station.* Upon completion of the work of construction of the curbing . . ., [the landowner] *was forced to close both his gasoline station and the restaurant." Id.* at 589-90, 160 A.2d at 717. (emphasis added)

In upholding the lower court's de facto taking finding in favor of the landowner, the Supreme Court reasoned that "[w]hile the Commonwealth did provide five accessways, . . . such ways were of such width and so located as to effect a practical denial of any access to the property for the purposes for which it was employed." *Id.* at 595, 160 A.2d at 720. Thus, the *McCrady* court held that "[e]quity, justice and an adherence to principles long recognized by this court in eminent domain proceedings require that this verdict be upheld." *Id.* at 598, 160 A.2d at 721.

Twelve years after the adoption of the Eminent Domain Code in 1964, an en banc panel of the Commonwealth Court revisited this issue in *Finkelstein v. PennDOT,* 23 Pa. Commw. 628, 354 A.2d 14 (1976). In

that case, a landowner "filed a petition for the appoint-ment of viewers, alleging that the Commonwealth unreasonably interfered with access to his property by constructing curbs where it was formerly possible to enter the lot to patronize his tenant's cleaning establishment" which ultimately ceased operations. *Finkelstein,* 23 Pa. Commw. at 629-30, 354 A.2d at 15. Relying upon *McCrady,* the trial court dismissed PennDOT's preliminary objections and PennDOT appealed asserting "that the existence of the curb[ed] depression in the southern boundary and the driveway at the western boundary constituted such reasonable and convenient access to [the] property as to preclude a claim for permanent interference of access under section 612." *Id.* at 630, 354 A.2d at 15-16. In affirming the lower court ruling, the en banc panel observed that as a result of PennDOT's construction, "the landowner has been 'faced with the alternatives of either ceasing any commercial operations on the premises or of relocating the buildings in which such operations took place to fit in with the new construction, particularly the location of the new accessways and curbing.' " *Id.* at 631-32, 354 A.2d at 16. The *Finkelstein* court distinctly "noted that *McCrady* was a pre-code case," but nonetheless concluded:

"However, since section 612 now allows such damages against the Commonwealth 'whether or not any property is taken,' and since 'permanent interference with access' is not defined by the code, a practical and logical approach is to apply pre-code law to determine if access has been permanently interfered with. Accordingly, the analysis used in *McCrady* is appropriate in the present case." *Id.* at 632 n.3, 354 A.2d at 16 n.3.

Similarly, the property owner in *Tracy v. PennDOT,* 43 Pa. Commw. 218, 220, 402 A.2d 286 (1979) argued that "[p]rior to [PennDOT's] road widening a good percentage of [his] patrons were truck drivers," but were not thereafter "because tractor-trailer trucks [could] not get out of his lot safely" due to the narrowing of access "throats." On appeal from the lower court's dismissal of PennDOT's preliminary objections, the Commonwealth Court analyzed *Wolf, Hession* and their progeny and distinguished them as "barrier" and "circuity" cases. Finding that the appeal was "controlled by a different strain of access cases" such as *McCrady* and *Finkelstein,* the court stated that "the trial court was correct in dismissing [PennDOT's] preliminary objections" and held:

"This is not a situation where the customers must take a longer route. As found by the trial court, the customers are effectively denied entry. A large proportion of [the landowner's] customers are tractor-trailer trucks. They can get in the . . . lot but they cannot get out safely from [Route] 119 and they cannot even get in safely from [Route] 26119. It is not a question of circuity or rerouting—the traffic which still goes by [the landowner's] property, but trucks with trailers cannot physically negotiate the parking lot with the new curbing. The problem here is not changed or circuited access, but for trucks it is *no access at all.*" *Id.* at 221, 401 A.2d at 287-88. (emphasis in original) Cf. *Newman,* 791 A.2d at 1290 (finding that property owner suffered a de facto condemnation as a result of a road construction project since "[d]uring PennDOT's 27-month construction, there was no reasonable ingress and egress from Newman's property, which resulted in the closure of Newman's business."); *PennDOT v. Richards,* 124 Pa. Commw. 432,

441, 556 A.2d 510, 514-15 (1989) (although construction activities did not preclude complete access, the road work constituted a substantial and permanent impairment recoverable under the code since motorists could not access the property without scraping the bottom of their vehicle on account of grading differences); *Friedman v. City of Philadelphia,* 94 Pa. Commw. 572, 575-76, 503 A.2d 1110, 1111-12 (1986) (distinguishing between a construction project which adversely impacts an individual's business and one that causes closure of a business and holding that temporary construction activities which force owners out of business constitute permanent interference establishing a de facto condemnation).

The credible evidence contained in the record submitted for our review establishes that PennDOT's narrowing of Sienkiewicz' Stafford Avenue accessways has effectively denied tractor-trailers, buses and large trucks a reasonable and safe means of ingress to and egress from Sienkiewicz' property. As a consequence, Sienkiewicz has experienced a significant decline in gasoline and convenience items sales and has been forced to close his business. Based upon the sound appellate reasoning in *McCrady, Finkelstein* and *Tracy,* and in light of the purpose for which Sienkiewicz previously used his commercial property, PennDOT's actions in this regard constitute a de facto condemnation under section 612 of the Eminent Domain Code. Accordingly, PennDOT's preliminary objections will be denied and the board of viewers will be directed to determine the amount of just compensation due under 26 P.S. §1-612.

## ORDER

And now, May 2, 2003, upon consideration of the "preliminary objections to amended petition for board of view" filed by defendant PennDOT, the memoranda of law, deposition testimony, exhibits and evidence submitted by the parties, and the oral argument of counsel on March 6, 2003, and based upon the factual findings and legal reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

"(1) Defendant's preliminary objections to plaintiff's amended petition for appointment of a board of viewers are denied and dismissed.

"(2) It is judicially declared that there has been a de facto taking by the defendant of the plaintiff's property at 2801 Stafford Avenue, Moosic, Lackawanna County.

"(3) The board of viewers appointed by order dated February 27, 2002, is directed to receive testimony and evidence to determine the amount of just compensation to be awarded to the plaintiff for the defendant's de facto taking of the plaintiff's property.