# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ronald L. Gallo | : | CASES CONSOLIDATED |
| | : | |
| v. | : | No. 131 C.D. 2022 |
| | : | |
| North Union Township and Redevelopment Authority of the County of Fayette | : | |
| | : | |
| Stephen R. Laskey | : | |
| | : | |
| v. | : | |
| | : | |
| North Union Township and Redevelopment Authority of the County of Fayette | : | |
| | : | |
| Appeal of: Cindy Lou Gallo and the Estate of Ronald Leo Gallo | : | |
| | : | |
| Ronald L. Gallo | : | |
| | : | |
| v. | : | No. 132 C.D. 2022 |
| | : | Argued: February 6, 2024 |
| North Union Township and Redevelopment Authority of the County of Fayette | : | |
| | : | |
| Stephen R. Laskey | : | |
| | : | |
| v. | : | |
| | : | |
| North Union Township and Redevelopment Authority of the County of Fayette | : | |
| | : | |
| Appeal of: Natalie R. Laskey and the Estate of Stephen R. Laskey | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MARY HANNAH LEAVITT, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**       **FILED: March 15, 2024**

Before the Court in these consolidated appeals are challenges to the Order of the Court of Common Pleas of Fayette County (trial court) that sustained the preliminary objections (POs) filed by North Union Township (Township) to the petitions for the appointment of a board of viewers (Petitions) filed by Ronald L. Gallo (Gallo) and Stephen R. Laskey (Laskey)[1] (together, Appellants), in which Appellants claimed their separate private properties were the subject of a *de facto* or inverse condemnation by Township, and dismissed the Petitions. On appeal, Appellants challenge the trial court's decision, claiming that Township's POs were untimely; the trial court erred in concluding they did not establish that Township's actions resulted in *de facto* takings of their properties; and the trial court committed various errors of law in considering legal issues it raised sua sponte and issuing findings of fact not supported by substantial evidence. Upon careful review, we affirm.[2]

---

[1] Both Gallo and Laskey predeceased the trial court's Order and their estates have continued this litigation. (Trial Ct. Decree, Findings of Fact (FOF) ¶¶ 1-2.) For ease, we, like the trial court, will continue to refer to Appellants as Gallo and Laskey.

[2] On June 14, 2022, this Court directed the parties to address whether Appellants complied with the Supreme Court's decision in *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018), *overruled in part by Commonwealth v. Young*, 265 A.3d 462 (Pa. 2021), relating to the need to file multiple notices of appeal when matters are consolidated before a trial court. The parties assert that *Walker* is inapplicable because Appellants' Petitions were consolidated for discovery purposes only and they filed separate notices of appeal at their respective dockets. We agree that this is not a *Walker* situation and that Appellants' appeals are properly before the Court.

2

# I.  BACKGROUND

### A. The Petitions

This matter involves two separate Petitions by Appellants, who own adjoining lots in the Mount Braddock Industrial Park (MBIP) that was developed by the Redevelopment Authority of Fayette County (Redevelopment Authority). These lots sit at the lowest point of the MBIP, with Gallo's property being slightly lower than Laskey's property. Gallo used his property for a home heating oil distribution business, while Laskey operated an appliance repair business on his. Township owns a property adjacent to Gallo's property on which a baseball field, playground, and parking lot are located, and above that property is a lot rented by Texas Eastern, which operates a pipe storage facility thereon. All of these properties are situated along Ainsley Lane, a dirt and aggregate road owned, along with drainage improvements thereto, by Township. Numerous other entities own property within the MBIP and are situated above and/or adjacent to Gallo's and Laskey's properties and ultimately discharge their stormwater onto Gallo's property.

On September 6, 2013, Gallo filed his Petition against Township and the Redevelopment Authority, asserting a claim for a *de facto* taking of his property due to ongoing flooding caused by stormwater runoff, which had transformed some of his property into unusable wetlands, substantially deprived him of the use and enjoyment of his property, and prevented the use of the property for his business. (Reproduced Record (R.R.) at 9a-15a.) Laskey filed his Petition on December 30, 2014, also against Township and the Redevelopment Authority, making nearly identical claims. (*Id.* at 2407a-12a.)

The Petitions are based on alleged inadequacies of drainage and stormwater management during the initial development of the MBIP by the Redevelopment

Authority, and subsequent development of the MBIP during the time when Township was responsible for stormwater management, resulting in Gallo's and Laskey's properties being flooded and damaged. (Trial Court Decree (Decree) at 2.) The Redevelopment Authority settled with Appellants,[3] which left their claims against Township outstanding.

Township filed POs to both Petitions, asserting that no compensable taking had occurred, to which Appellants filed answers. (R.R. at 7a, 51a-62a, 2405a, 2448a-58a.) Township subsequently filed Supplemental POs to both Petitions, asserting the Petitions were time barred, to which Appellants filed their own preliminary objections, challenging the propriety of Township filing Supplemental POs. (*Id.* at 3a, 2241a-53a, 2402a, 2491a-2511a.)

Multiple hearings on the condemnation claims were held and the trial court viewed the properties. Appellants introduced the testimony of Gallo and Laskey; Patrick Gavaghan and Ryan Nelson to establish the existence of wetlands on the properties; John Over of K-2 Engineering to prove what was causing the flooding; and Abbey Owoc of the Pennsylvania Department of Environmental Protection (DEP), who outlined DEP's involvement and suggested resolution for reduction of the flooding. Township offered the testimony of Curtis Matthews, a Township Supervisor and Road Master who was actively involved in these matters. Based on the evidence presented, the trial court rendered findings of fact and conclusions of law, as set forth below, regarding the properties, their flooding, Township's and others' actions, and whether Township's actions effectuated a *de facto* condemnation.

---

[3] The Redevelopment Authority paid $45,000 to Laskey and $60,000 to Gallo. (Decree at 3.)

*B. The MBIP and the Properties*

Beginning in the 1970s, the Redevelopment Authority acquired numerous properties, demolished the buildings thereon, combined the properties, and then re-subdivided them as the MBIP. (R.R. at 35a (referencing the Redevelopment Authority's acquisition of title to Gallo's property via condemnation proceedings in 1972).) The Redevelopment Authority was responsible for stormwater planning in the MBIP until 2005, when Township assumed regulatory control over stormwater management within its jurisdiction. (Decree, Finding of Fact (FOF) ¶ 8.)

Gallo purchased his property from the Redevelopment Authority in 1994 for $14,500, and as part of the purchase, the Redevelopment Authority added 12 acres of property behind the Gallo and Laskey properties for no additional consideration. (*Id.* ¶ 5.) Laskey purchased his property from a third party for a similar price, also in 1994. (*Id.*; R.R. at 2413a.) There was alleged correspondence from the Redevelopment Authority advising Gallo of the wet conditions of the property, which Gallo denied receiving, but Gallo testified that the price was reasonable because of the need for fill and the low-lying nature of the property. (FOF ¶ 5; R.R. at 72a-74a.) Gallo brought in fill and leveled two and a half acres of his property adjoining Ainsley Lane, which the trial court found necessarily contributed to the flow of water onto Laskey's property. (FOF ¶ 7.)

The additional property conveyed to Gallo by the Redevelopment Authority

> was a flat recess at the uphill end of a shallow "hollow" that was drained by a shallow swale (referred to as a ditch in some testimony) that traveled in a generally northward direction across the back of two other parcels (now Holt and Bugbee [(Holt)] and Dynamic Materials [Corporation (DMC)]) in the [MBIP], which, in turn, was drained by a culvert under a Township Road and into Gist[] Run.

There was always an existing "large mud puddle" on the rear acreage of the Gallo property. After the [MBIP] was developed, the "mud puddle" became a much larger shallow "pond." The soil surrounded the pond has converted into "hydric" soil[,] which operates to hold water like clay or a plastic liner would. Over a period of time, the original "mud puddle" . . . has grown into a shallow pond that has reputedly been as large as eight acres.

(*Id.* ¶¶ 16-17.) Part of Gallo's *de facto* condemnation claim is the increase in the size of this pond and the assertion that the pond will continue to grow until it floods the improvements on both Gallo's and Laskey's properties. (*Id.* ¶ 6.)

The trial court described several of the properties surrounding Gallo's and Laskey's properties as follows. The Holt and DMC

properties are situated to the north of the Gallo pond, and the original drainage pathway from the Gallo pond traverses the rear of those two properties. The Holt . . . property is immediately north of and adjoins the Gallo property. The [DMC] property is to the north of the Holt . . . property, and is generally further "downstream" from the Gallo pond. From the [DMC] property, storm[]water flows through a Township culvert under Mount Braddock Road and into Gist[] Run.

[] In 2006, [DMC] obtained a stormwater management permit from . . . Township. Stormwater management improvements were installed that match the permitted plan, but specific elevations and grades for the DMC drainage improvements relative to the elevation of the Gallo pond were never supplied to the [trial c]ourt. No direct evidence was offered to show that the plan was faulty, or that the improvements were installed in a faulty manner. Nevertheless, the drainage pathway from the Gallo pond has clearly been "degraded." There was testimony that the retention pond on the [DMC] property has never had to hold water.

(*Id.* ¶¶ 9-10.) No witness could state how, where, or when the drainage swale or ditch was filled, raised, or narrowed. (*Id.* ¶ 19.)

6

*C. The Flooding of the Properties and Township's Actions*

It is unclear from the record exactly when the flooding of Gallo's property began, but Gallo testified that it gradually began as an occasional issue around 2004, with an increase in flooding in the front of his property around 2007 or 2008. (R.R. at 96a-97a; FOF ¶ 13.) The trial court found that this flooding occurred after heavy rainfalls, including rainfalls that "were historically significant in terms of the amount of precipitation that fell in a short period of time, and coincided with other flooding in the general area." (*Id.* ¶ 13.) Per the trial court, this

> [f]looding was exacerbated because property development and road maintenance uphill of [Gallo's and Laskey's] properties altered the natural water flows into a faster and more concentrated pattern. The uphill development that contributed to this condition included [] Township's construction of a "baseball field," and [] Township's maintenance of Ainsley Lane and the associated drainage ditches and culverts. Another uphill development that contributed to the flooding condition was a "pipe yard" developed by Texas Eastern[], and Texas Eastern's permitted private maintenance of Ainsley Lane. Laskey's claims associated with these specific uphill developments were litigated separately [(Trespass Action)]. Most of the claims were resolved by settlement . . . [except] Texas Eastern assigned its cross-claim against [Township] to Laskey[, which remained] . . . pending [at docket No. 981 G.D. 2011[4]] on appeal following a jury trial.

(*Id.* ¶ 14.) The trial court purported to "incorporate[] by reference" the entire record in the Trespass Action in this matter. (*Id.* ¶ 15.)

Additional drainage onto Gallo's property, the trial court found, may also come from the Holt property, which although "downstream," was filled in and raised to an elevation above the Gallo pond. (*Id.* ¶ 21.) At some point, Gallo sold or leased part of the rear of his land for a railway siding and associated development, which

---

[4] There are presently appeals relating to the Trespass Action before the Court. *Laskey v. N. Union Twp.* (Pa. Cmwlth., Nos. 919 & 987 C.D. 2021).

7

the trial court likewise found Appellants had not proven that this did not contribute to the flooding. (*Id.* ¶ 20.) In regard to uphill drainage from other properties within the MBIP, Appellants claimed the flooding from this drainage was the result of Township's failure to enforce its Stormwater Management Ordinance (Stormwater Ordinance) as to those properties. (*Id.* ¶¶ 12, 22, 40.)

The trial court found that when flooding of the properties became an issue, Township, through Matthews, attempted to alleviate it by digging a ditch along the Gallo/Laskey property line so as to drain water away from the improved portions of the properties. (*Id.* ¶ 28.) Without seeking professional advice or consulting with Township, Appellants agreed to fill the ditch, citing concerns over the legal liability of having an open ditch and their belief that the ditch was not working. (*Id.* ¶¶ 29, 31.) When the trial court inquired about whether the ditch could have connected with Gist Run via an unnamed tributary and an existing sump and culvert on Laskey's property, which, from the trial court's view, may have been low enough to be a possible solution, Appellants maintained it could not have been connected. However, the trial court found that Appellants did not provide evidentiary support to establish that the elevation of the respective properties precluded this solution despite the trial court's request for that information after its view of the properties. (*Id.* ¶¶ 30, 48.) Further, the trial court did not credit Appellants' testimony that the ditch did not help and, therefore, it held they did not prove that their own actions in filling the ditch did not contribute to their flooding problems. (*Id.* ¶ 31.)

After experiencing repeated flooding, Laskey reached out to DEP in 2010 to inquire what could be done about the flooding; Gallo eventually also communicated with DEP about his property. (R.R. at 107a-09a.) DEP held meetings, attended by entities within the MBIP, Township, Laskey, and Gallo to discuss potential solutions

8

for the flooding. A plan was developed and, for a time, the Pennsylvania Department of Transportation (DOT) intended to fund the project, but eventually the funding was withdrawn due to, among other issues, the existence of underground utility lines. (*Id.* at 836a, 839a, 841a.) Although Township initially supported the plan, which sought to recreate the drainage swale across Holt's and DMC's properties and the potential installation of a new, larger culvert under Mount Braddock Road to replace the existing culvert, it subsequently indicated it would not participate at this time citing the cost, DOT's discovery of underground issues, and the ongoing litigation with Laskey. (FOF ¶ 54.)

As for Ainsley Lane, Township had agreed to pave Ainsley Lane and install a drain in front of Laskey's property parallel to and downhill from Ainsley Lane, as designed by Laskey's engineer, as part of an agreement with Texas Eastern, which provided $50,000 to Township to do so. (*Id.* ¶¶ 24, 60.) Township claimed it sought an easement from Laskey to install the drain, but Laskey refused to give an easement and, therefore, Township did not construct the drain. (*Id.* ¶ 24.) Eventually, Texas Eastern filed a counterclaim in the Trespass Action seeking the return of its monies, which Texas Eastern subsequently assigned to Laskey as part of its settlement with Laskey in that action. (*Id.* ¶ 60.) Laskey then asserted Texas Eastern's claim against Township seeking payment of the $50,000 to him. Matthews testified that Township was not proceeding with the paving at this time given the uncertainty relating to the ongoing litigation and the concern that paving the roadway would merely increase the impervious surfaces over which stormwater would flow. (R.R. at 923a-24a, 994a, 997a.)

Ultimately, Gallo and Laskey had their properties inspected to ascertain if there were any wetlands thereon. Following inspections of the Gallo property,

Gavaghan opined that the historic drainage path for Gallo's property, across the Holt and DMC properties, was no longer functioning and that a portion of Gallo's property was wetlands as defined by federal regulations and could not be filled or drained without permission from DEP or the United States Army Corps of Engineers (ACE). (FOF ¶¶ 36-37.) Nelson testified similarly that part of Laskey's property was a wetland. (R.R. at 301a.) In February 2013, Gallo was advised by DEP that he could not use, access, or alter the back of his property if it was determined to be a wetland, absent a permit from either DEP or ACE. (FOF ¶ 35.) As of November 20, 2018, DEP had not delineated either property as containing wetlands. (R.R. at 848a; FOF ¶¶ 36, 38, 63.)

### D. The Trial Court's Decree and Order

The trial court examined the evidence regarding the flooding of the properties, Appellants' actions, Township's actions, and the actions of third parties and addressed the various alleged causes of that flooding to determine if Township was liable for a *de facto* condemnation. The trial court found that the real issue causing the flooding related to the pond and the lack of drainage it once had. In particular, the trial court found that there had to be some upstream obstructions of the drainage swale, either on Gallo's or Holt's property, that prevented the drainage of the pond; otherwise, it would drain as it had in the past. (FOF ¶ 11.) The trial court also pointed to drainage from other sources, such as Holt's property and Gallo's own actions in selling or leasing a portion of his property, as possible causes of the flooding, none of which had to do with Township's actions. (*Id.* ¶¶ 20-21.)

The trial court further reasoned that, although Appellants argued that the stormwater runoff from Township's baseball field and Ainsley Lane was one of the bases for their inverse condemnation claims, those claims were more in the nature

10

of negligence/real estate claims and were, or should have been, resolved in the Trespass Action. (*Id.* ¶¶ 33, 53, 57.) Thus, the trial court concluded that "[t]he uphill water drainage from [] [Township] property and roadway [could not] properly be the basis for a finding of inverse condemnation." (*Id.* ¶¶ 33, 50.) The trial court acknowledged that Laskey reserved his inverse condemnation claims in his settlement of the Trespass Action with Township, but the trial court found that the reserved claims did not relate to the uphill flooding sources, i.e., the baseball field and Ainsley Lane. (*Id.* ¶ 50.)

The trial court also addressed the claims related to Township's actions, or inaction, in relation to improving Ainsley Lane. The trial court noted that Laskey had not sought other relief, either in mandamus or as specific performance, to force Township to install the drain. (*Id.*) To the extent Township had not used monies that Texas Eastern paid to pave Ainsley Lane and install this drain, the trial court found Township's failure to do so at this time was justifiable because Laskey had sued Township seeking to recover those monies based on the assignment of that claim Laskey received in his settlement with Texas Eastern in the Trespass Action. (*Id.* ¶ 60.) If Township made the improvements and Laskey prevailed in his suit on the assigned claim, the trial court reasoned, Township, and its taxpayers, would have to expend twice the amount of money to fix problems caused by Texas Eastern. (*Id.*) It also reiterated that, regardless of the reason for Township's failure to do this, the flooding issues stemming from the uphill properties (Texas Eastern and the baseball field) and Ainsley Lane could not be the basis of a *de facto* condemnation. (*Id.* ¶ 61.)

As to the extent other uphill land developments existed and may have reduced or eliminated the absorbative properties of existing vegetative cover or native soils, contributing to the speed at which precipitation flows to the Gallo property, the trial

11

court held that the total amount of water had not been significantly increased and the contours and size of the drainage basin were unchanged. (*Id.* ¶ 23.) The trial court found that it was possible that some of these developments took place before Township assumed control of the area's stormwater management. In that respect, the trial court concluded that "it [was] apparent that the subdivisions prepared and recorded by [the Redevelopment Authority] did not adequately address storm[]water management[] and did not expressly set forth drainage easements or responsibilities through the properties now owned by Gallo, by Holt . . . , and by [DMC]." (*Id.* ¶¶ 3, 9.) The trial court also held it was not possible "to attribute causation to faulty enforcement by [] Township." (*Id.* ¶ 41.) This was because, the trial court posited, all of the upstream properties had always drained through the Gallo property, with only the speed and location of where the upstream water arrives changing, and no long-term ponding would be an issue on Gallo's property had the downstream drainage of Gallo's property, through the Holt and DMC properties, not been degraded. (*Id.* ¶ 42.) The trial court found there were no allegations that Township itself installed any of the drainage pathways to the pond, and Appellants' assertions that Township should be liable because of the failure of the MBIP drainage system were untenable because it was the Redevelopment Authority that was responsible for that failure. (*Id.* ¶¶ 43-44.)

With respect to the solution proposed by DEP, the trial court did not accept Appellants' proposed finding that DEP's Owoc told Laskey that Township would not permit the installation of a pipe to reopen the ditch unless Laskey dropped the Trespass Action, citing the multiple layers of uncorroborated hearsay in Laskey's testimony. (*Id.* ¶ 54.) The trial court also rejected the idea that a new culvert was needed as the existing one had drained the entire watershed in the past and observed

that the responsibility for degradation of the prior ditch was on Holt and DMC, which had a common law obligation not to restrict that drainage and cause flooding. (*Id.* ¶¶ 54, 64.)

Based on its findings, the trial court concluded that Appellants had not met their burden of proving that Township had effectuated a *de facto* condemnation of their properties. (Decree, Conclusion of Law (COL) ¶ 23.) It held that while Township had the legal authority to condemn property, the rear of Gallo's property never had significant value and the conditions at the time of its acquisition precluded substantial development of that property, and any deprivation to Appellants' use and enjoyment of their properties was not the result of Township's exercise of its condemnation power. (*Id.* ¶¶ 2-4.) The trial court explained that Township was not responsible for any improper stormwater management planning before it became responsible for that planning in 2005, Township was not a guarantor of the efficacy of those improvements, and common law principles regarding surface water and upstream and downstream property owners were still applicable. (*Id.* ¶ 6.)

As to the flooding caused by upstream property owners, the trial court concluded that problems caused by Texas Eastern, the baseball field, and Ainsley Lane were not condemnation claims but negligence claims, and that the problems caused by other entities or properties were not fully developed or shown to be the result of Township's intentional actions to allow excessive volume or velocity of stormwater drainage any time after 2005. (*Id.* ¶¶ 8-9.) The trial court concluded the evidence established that it is obstructions restricting the flow of water from the Gallo pond, which must be present below the pond (either on Gallo's, Holt's, and/or DMC's properties), that are causing the pond to grow. (*Id.* ¶¶ 11-12.) As there was no evidence that Township took affirmative action to allow or cause the obstruction

13

of the drainage pathway, "[n]o intentional conduct by [] Township in obstructing the flow downstream of the Gallo pond has been proven." (*Id.* ¶ 18.) To the extent there are wetlands now on Gallo's and Laskey's properties, precluding their development without a permit from DEP or ACE, the trial court concluded no official designation by those entities has taken place and, if development is prohibited, that issue should be addressed to those governmental agencies, as Township is not responsible for the enforcement of those regulations. (*Id.* ¶¶ 21-22; FOF ¶¶ 36, 38, 63.) Accordingly, the trial court sustained Township's POs and dismissed the Petitions.

Appellants filed separate notices of appeal at their respective dockets and filed Concise Statements of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b), as directed by the trial court. The trial court issued a statement in lieu of opinion. This Court sua sponte consolidated the appeals. Following briefing and oral argument, these appeals are ready for disposition.[5]

## II.    DISCUSSION

### A.    *Were Township's POs Timely and Supplemental POs Permitted?*

#### 1. Parties' Arguments

Appellants first argue the trial court erred in sustaining Township's POs because those POs were not timely filed and the Supplemental POs were improperly filed, and, therefore, the trial court should have dismissed those filings. Gallo asserts his Petition was filed on September 6, 2013, and Township's initial POs were not

---

[5] In reviewing a trial court's decision on preliminary objections in an eminent domain proceeding, we must "determine whether the trial court abused its discretion or committed an error of law." *In re Mountaintop Area Joint Sanitary Auth.*, 166 A.3d 553, 559 n.8 (Pa. Cmwlth. 2017) (*DeLuca*). As factfinder, the trial court "must resolve evidentiary conflicts, and its findings will not be disturbed if supported by substantial evidence." *Id.*

14

filed until February 4, 2014, and May 29, 2014,[6] and its Supplemental POs were filed in June and July 2020. Laskey maintains that he filed his Petition on December 30, 2014, and Township did not file its POs until March 23, 2015, and its Supplemental POs were filed in June 2020. Appellants argue that, pursuant to Section 504(d)(1) and (2) of the Eminent Domain Code (Code), 26 Pa.C.S. § 504(d)(1), (2), preliminary objections must be filed within 30 days of the receipt of notice of the appointment of viewers, that issues not raised in the preliminary objections are waived, and that the amendment to the preliminary objections was not authorized here.[7] While acknowledging that no appointment of viewers occurred here, Appellants point out that the Code contains no specific deadline for filing preliminary objections to a petition for the appointment of viewers and assert there must be a deadline for doing so. Whether that deadline is 30 days under Section 504(d)(1) or 20 days pursuant to Section 504(d)(3) (giving 20 days for the filing of

---

[6] Two sets of POs were filed by separate attorneys who entered their appearances on behalf of Township, and Gallo's subsequent response to the POs made no procedural objections to the POs and was served on both counsel. (Original Record (O.R.) Item 12.)

[7] Appellants cite Pennsylvania Rule of Civil Procedure 1033(a), Pa.R.Civ.P. 1033(a). Rule 1033(a), for support, which states:

> A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, add a person as a party, correct the name of a party, or otherwise amend the pleading. The amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense. An amendment may be made to conform the pleading to the evidence offered or admitted.

Pa.R.Civ.P. 1033(a). However, the Rules of Civil Procedure are not applicable in eminent domain cases. *In re Condemnation by City of Coatesville*, 898 A.2d 1186, 1189 n.7 (Pa. Cmwlth. 2006). Instead, a trial court may allow amendments to preliminary objections filed in eminent domain proceedings where doing so "would [] serve the administration of justice" and there was no prejudice to the adverse party. *Dep't of Transp. v. Schodde*, 433 A.2d 143, 145 (Pa. Cmwlth. 1981).

an answer with or without new matter to the preliminary objections), Township's POs were not timely filed and its Supplemental POs, filed without permission by either of Appellants or the trial court, are impermissible. Accordingly, Appellants contend the trial court should have dismissed those filings and appointed viewers.

Township responds that Section 504(d)(1) requires that preliminary objections be filed within 30 days of receiving notice of the appointment of viewers and no such appointment has occurred in this matter. Thus, Township argues its POs, which alleged questions of law and fact, required the trial court to hold a hearing and its Supplemental POs were properly filed given the development of evidence during the consolidated discovery process.

2. Analysis

Section 502(c) of the Code authorizes the filing of a petition for the appointment of viewers when a condemnation occurs without a declaration of taking being filed, stating:

> (1) An owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking may file a petition for the appointment of viewers . . . .
>
> (2) The court shall determine whether a condemnation has occurred, and, if the court determines that a condemnation has occurred, the court shall determine the condemnation date and the extent and nature of any property interest condemned.
>
> (3) The court shall enter an order specifying any property interest which has been condemned and the date of the condemnation.
>
> (4) A copy of the order and any modification shall be filed by the condemnor in the office of the recorder of deeds of the county in which the property is located and shall be indexed in the deed indices showing the condemnee as grantor and the condemnor as grantee.

16

26 Pa.C.S. § 502(c). Section 504 discusses a court's appointment of viewers after the filing of a petition, and subsection (d) addresses preliminary objections, providing:

(1) Any objection to the appointment of viewers may be raised by preliminary objections filed within 30 days after receipt of notice of the appointment of viewers.

(2) Objections to the form of the petition or the appointment or the qualifications of the viewers in any proceeding or to the legal sufficiency or factual basis of a petition filed under [S]ection 502(c) (relating to petition for appointment of viewers) are waived unless included in preliminary objections.

(3) An answer with or without new matter may be filed within 20 days of service of preliminary objections, and a reply to new matter may be filed within 20 days of service of the answer.

(4) The court shall determine promptly all preliminary objections and make any orders and decrees as justice requires.

(5) If an issue of fact is raised, the court shall conduct an evidentiary hearing or order that evidence be taken by deposition or otherwise, but in no event shall evidence be taken by the viewers on this issue.

26 Pa.C.S. § 504(d). Preliminary objections are the exclusive means in an eminent domain proceeding to raise legal and factual challenges to a petition for appointment of viewers alleging a *de facto* taking. *In re Mountaintop Area Joint Sanitary Auth.*, 166 A.3d 553, 560 n.9 (Pa. Cmwlth. 2017) (*DeLuca*).

Appellants fault the trial court for not dismissing the POs and Supplemental POs due to being either untimely or improperly filed. However, a review of the record reflects that Appellants did not challenge the timeliness or propriety of Township's POs to Gallo's Petition or to Laskey's Petition, by filing their own preliminary objections raising that issue. (*See* R.R. at 7a (docket reflecting no

17

preliminary objections to Township's POs filed to Gallo's Petition on those dates), 2405a (docket reflecting that no preliminary objections were filed to Township's POs filed to Laskey's Petition on that date).) Instead, Appellants, respectively, filed answers to the POs responding to the merits of the POs but not challenging the timeliness of them. (*Id.* at 7a, 2405a; Original Record (O.R.) Item 12 (Gallo); O.R. Item 13 (Laskey).) This Court has held, however, that

> the proper manner in which to raise a challenge to [a] preliminary objection[] would [ ] be[] by a preliminary objection to the preliminary objection[] in the form of a motion to strike for lack of conformity to the law or rule of court.

*German v. City of Philadelphia*, 683 A.2d 323, 326 (Pa. Cmwlth. 1996) (quoting *In re Condemnation of Premises 320 Crestview Circle*, 449 A.2d 820, 822 (Pa. Cmwlth. 1982)). If a challenge is not raised this way, "the petitioners are deemed to have waived their objection to the untimeliness of [the] pleading." *Id.* (quoting *320 Crestview Circle*, 449 A.2d at 822). Appellants did not file preliminary objections to Township's POs or challenge timeliness in their answers. Rather, the legal and factual issues raised in Township's POs were before the trial court, and the latter issues required the holding of a hearing. *DeLuca*, 166 A.3d at 560. Thus, we discern no error in the trial court not dismissing Township's POs on this basis.[8]

As for the Supplemental POs, which reasserted Township's claims that the Petitions were factually and legally insufficient and also challenged the Petitions on the basis that they were time barred based on evidence obtained during the hearings,

---

[8] Even had the issue been raised, Section 504(d)(1) requires the filing of preliminary objections within 30 days of notice of the appointment of the viewers, not to the filing of a petition for the appointment of viewers. 26 Pa.C.S. § 504(d)(1). Accepting Appellants' arguments that they are entitled to the appointment of viewers and a calculation of damages because Township's POs to the Petitions were untimely appears to be inconsistent with that statutory language because Township could have, under that language, filed its POs after the trial court appointed the viewers.

18

(R.R. at 2241a-43a, 2499a-2502a), Appellants did file preliminary objections to the Supplemental POs, arguing that the supplemental filings were not authorized by the Code and moving to strike those pleadings, (*id*. at 2246a-50a, 2504a-08a). We agree with Appellants that, in providing that challenges to a petition to appoint viewers or to the appointment of viewers are to be made via preliminary objections, the legislature expressed its intent that legal or factual issues not included therein were waived. 26 Pa.C.S. § 504(d)(2). However, we have held that a trial court may allow amendments to preliminary objections filed in eminent domain proceedings where doing so "would [] serve the administration of justice" and there was no prejudice to the adverse party. *Dep't of Transp. v. Schodde*, 433 A.2d 143, 145 (Pa. Cmwlth. 1981). The trial court did not rule on Appellants' preliminary objections to Township's Supplemental POs, which likely should have been sustained and the Supplemental POs stricken as unauthorized. Nonetheless, any error in not doing so is harmless because the only issue newly raised was that the Petitions were barred by the statute of limitations, and the trial court did not grant Township relief on that basis. Accordingly, this is not a reason to reverse the trial court's Order.

### B. Did Appellants Establish Township's De Facto Taking of Their Properties?

#### 1. Parties' Arguments

The trial court concluded Appellants did not meet their heavy burden of proving that Township's actions resulted in a *de facto* taking of their properties under the above standards. Appellants argue[9] the trial court erred in reaching this conclusion because they established by a fair preponderance of the evidence that their properties have been subjected to continuous and pervasive flooding resulting

---

[9] Appellants' arguments in their separately filed briefs are practically identical.

19

from stormwater runoff, creating wetlands, and interfering with their use and enjoyment of those properties. According to Appellants, Township is liable for that interference and the *de facto* taking of their properties because it knew of the stormwater runoff in 2010 but did not take any efforts to resolve the issue, and, instead, engaged in activities that worsened the runoff. Appellants point to the following actions of Township (or inactions) as the basis for their *de facto* condemnation claim: the creation and maintenance of the baseball field; the grading and maintenance of Ainsley Lane; the improper regulation of stormwater facilities within the MBIP and the permitting of unchecked development in the MBIP since the passage of the first Stormwater Ordinance in 2005; and the refusal to take remedial actions, suggested by DEP, to resolve the stormwater issues. These actions were intentional, Appellants contend, and resulted in the diversion of stormwater runoff and change in the quantity and rate of stormwater flowing onto their properties, foreseeable flooding of their properties, and creation of wetlands that hinder their ability to use the properties. Specifically, Appellants argue Township's improper administration of its Stormwater Ordinance, by allowing unchecked or unregulated development in the MBIP, along with its failure to fix issues with Ainsley Lane, is akin to the improper operation of the sanitary authority's facilities in *DeLuca* that formed the basis of the *de facto* taking in that matter. Appellants further assert that Township's refusal to resolve issues with Ainsley Lane or cooperate with DEP's plan was not reasonable, as the trial court found, but was intended to force Laskey to withdraw his lawsuits.

Township argues the trial court correctly held that Appellants did not meet the heavy burden of proving all of the elements of a *de facto* condemnation of their respective properties. It first asserts that the water flow and flooding Appellants

argue are caused by Township's actions are really the result of extremely heavy rainfall common to the county as well, the natural flow of water downhill to their respective properties, and the Redevelopment Authority's failure to include appropriate stormwater facilities when developing the MBIP, a failure the Redevelopment Authority recognized when it settled Appellants' *de facto* condemnation claims against it. Township next argues Appellants did not establish that the periodic and intermittent flooding by stormwater runoff has significantly interfered with Appellants' use and enjoyment of their properties, as they both continued to operate their respective businesses thereon. To the extent Gallo's business is no longer operational at the time of the filing of its brief, Township contends it is not because of any stormwater flooding but due to personal decisions made by Gallo's children. It maintains Appellants were aware that their properties were subject to flooding, which was reflected in their sales prices, Gallo's subsequent action in adding fill to increase the height of part of his property to above Ainsley Lane, and Laskey's purchase of flood insurance from which he recovered damages at one point.

Township maintains that, as was found by the trial court in Laskey's Trespass Action, Gallo's elevation of his property caused stormwater to flow from Gallo's property onto Ainsley Lane and Laskey's property. According to Township, Over's expert testimony revealed it was the Redevelopment Authority's actions that were the primary cause of the flooding issues and preceded Township's adoption of the Stormwater Ordinance, along with the natural flow of water to the lowest point within the MBIP, which is Appellants' properties. The flooding of such properties, Township argues, is not a basis for a *de facto* condemnation absent a showing that Township altered the flow of the water or unreasonably increased the quantity of

21

water. *Snap-Tite, Inc. v. Millcreek Township*, 811 A.2d 1101, 1106 (Pa. Cmwlth. 2002). Contrary to Appellants' arguments, and consistent with the trial court's findings, Township asserts its changes to the baseball field and regular maintenance of Ainsley Lane, which were not alterations to the grade of that roadway and has been inspected by DOT and found to be sufficient, improved the situation by diverting water onto Township property and away from private properties. It argues that *DeLuca* is distinguishable, as Township cannot control rainfall or the way that stormwater normally flows from higher properties to lower properties, it did not engage in any intentional action in order to burden a particular property, and the intermittent flooding did not preclude the continued use of the properties, making this matter more like *McMaster v. Township of Bensalem*, 161 A.3d 1031 (Pa. Cmwlth. 2017). Township disagrees it has any legal obligation to fix Appellants' properties as it has done nothing to cause the issues thereon and no evidence was presented to demonstrate that the actions it did take altered the natural flow or increased the quantity of water flowing onto the properties. Township further points to actions taken by both Gallo and Laskey that did not help the flooding, including Gallo's filling in the drainage ditch Township installed and Gallo's raising the elevation of his property to above Ainsley Lane, and Laskey's paving of his driveway and increasing the impervious surface on his property. For these reasons, Township argues Appellants did not meet their burden of proof, the POs were properly sustained, and the Petitions were correctly dismissed.

2. Analysis

It is well settled that

[article I, section 10 of t]he Pennsylvania Constitution provides that private property cannot be taken for public use without just

22

compensation. PA. CONST. art. I, § 10. "[A] *de facto* taking occurs when an entity clothed in the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property." *In re De Facto Condemnation [&] Taking of Lands of WBF Assoc[s.], L.P. ex rel. Lehigh-Northampton Airport Auth*[.], . . . 903 A.2d 1192, 1199 ([Pa.] 2006). A property owner carries a heavy burden of proof in *de facto* condemnation proceedings and must show that[] (1) the condemnor has the power to condemn the land under eminent domain procedures; (2) [] exceptional circumstances have substantially deprived him of the use and enjoyment of his property; and (3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the eminent domain power. *Genter v. Blair C[nty.] Conv[. &] Sports Facilities Auth*[.], 805 A.2d 51, 56 (Pa. Cmwlth. 2002). Finally, when determining whether a *de facto* taking has occurred, we focus on the governmental action in question. *Appeal of Jacobs*, . . . 423 A.2d 442, 443 ([Pa. Cmwlth.] 1980).

On the other hand, acts that are not the immediate, necessary or unavoidable consequence of the exercise of eminent domain will not form the basis of [a] *de facto* condemnation. *Fulmer v. White Oak Borough*, . . . 606 A.2d 589, 590 ([Pa. Cmwlth.] 1992). "Generally, where a landowner suffers specific damage to his property as a result of the negligent acts of a party with the power of eminent domain, the proper action lies in trespass." *Poole v. Township of District*, 843 A.2d 422, 424 (Pa. Cmwlth. 2004). Nevertheless, the two species of action are not mutually exclusive. A judgment in trespass does not bar a subsequent condemnation claim. *Matter of Condemnation by Urban Redevelopment Auth*[.] *of Pittsburgh*, . . . 458 A.2d 622, 623 ([Pa. Cmwlth.] 1983).

*DeLuca*, 166 A.3d at 561 (some alterations added). "Where a *de facto* taking claim is based on harm from surface waters, the property owner must also show that the entity with eminent domain power diverted the water from its natural channel or changed the quality or quantity of water flowing onto the property." *McMaster*, 161 A.3d at 1036. The change in quality or quantity of water must be "unreasonabl[e] or unnecessar[y]." *Snap-Tite, Inc.*, 811 A.2d at 1106. "Speculative or conjectural harms are insufficient to show the substantial deprivation of use and enjoyment

necessary to a *de facto* taking claim." *McMaster*, 161 A.3d at 1037. Injuries to a property that are abatable, preventable, or reparable similarly do not constitute a *de facto* taking. *Id.* To constitute a *de facto* taking, the overflow must become an "actual, permanent invasion of the land amounting to an appropriation thereof, and not merely an injury to the property." *Snap-Tite, Inc.*, 811 A.2d at 1106-07 (quoting *Oxford v. Dep't of Transp.*, 506 A.2d 990, 994 (Pa. Cmwlth. 1986)).

Here, Appellants allege a *de facto* condemnation due to Township's actions related to the baseball field and the maintenance of Ainsley Lane and improper administration of its Stormwater Ordinance, thereby allowing development within the MBIP, including the alleged "filling in" of the ditch on the Holt and DMC properties, without consideration of the effect on Appellants' properties.

### a. Township's Baseball Field and Ainsley Lane

We begin with the allegations related to Township's baseball field and maintenance of Ainsley Lane, including that Township has intentionally not maintained Ainsley Lane in order to coerce Laskey into withdrawing his lawsuit. The trial court found that these issues could not be the basis of a *de facto* condemnation claim because they were negligence/real estate claims that were resolved, or should have been resolved, in Laskey's Trespass Action. As to Laskey, we agree that these claims could not be the basis of his condemnation action. During Laskey's testimony, Laskey's counsel specifically disclaimed, as being a basis for Laskey's inverse condemnation claim, any issues related to runoff from the baseball field and Ainsley Lane as being a part of Laskey's eminent domain case. (R.R. at 2150a-52a.) Rather, counsel stated, "Mr. Laskey has only alleged that the flooding from the rear of his property that [is] coming off the Gallo property, which began in 2011, 2012, is the flooding that has not stopped and has not ceased and will not stop

24

and, therefore, that is the eminent domain taking." (*Id.* at 2151a, 2162a-64a (indicating the eminent domain case was about flooding in the back of his property).) Thus, we cannot say the trial court erred in rejecting these allegations as supporting Laskey's *de facto* condemnation claim.

Gallo, on the other hand, made no such concession and argues that the established stormwater runoff from the baseball field and Ainsley Lane, exacerbated by Township's failure to maintain that road, have substantially deprived him of the use and enjoyment of his property and inability to operate his business. Whether Gallo met his burden on this issue is a close question, as the trial court found that "property development and road maintenance uphill of [Gallo's] propert[y] altered the natural water flow[] into a faster and more concentrated pattern," and the baseball field and maintenance of Ainsley Lane "contributed" to this process. (FOF ¶ 14.) However, the trial court also found that "the total amount of water flow ha[d] not been significantly increased, as the general contours and size of the drainage basin [were un]changed" by the uphill land developments, which had always drained onto Gallo's property, and the issue of the flooding thereof was related to the downhill drainage of the pond, rather than stormwater flowing onto Gallo's property. (*Id.* ¶¶ 23, 42.) Notably, to prove a *de facto* taking based on harm from surface water, the **change** in quality or quantity of water had to be **unnecessary or unreasonable**. *Snap-Tite, Inc.*, 811 A.2d at 1106. Here, Over testified that the baseball field and Ainsley Lane were "factors" in the stormwater runoff, but he provided no detail as to the extent they increased or changed the stormwater runoff or whether any such increase or change was "unreasonable or unnecessary." (R.R. at 388a-91a, 403a-04a.) According to Over, there were ways to determine the amount of stormwater runoff from individual properties that ended up on Gallo's property, but he did not

25

perform any of those calculations in this matter. (*Id.* at 748a-51a, 761a-62a, 768a-69a.)

Further, while Gallo argues that Township's "refusal" to pave Ainsley Lane or otherwise maintain Ainsley Lane based on the ongoing Laskey litigation reflects intentional action to increase the stormwater runoff onto Gallo's property, the trial court found Township's action justifiable given the uncertainty caused by Laskey's litigation. (FOF ¶¶ 24, 60.) Matthews did not testify that Township was never going to make the improvements in Ainsley Lane but questioned doing so during the ongoing litigation because of a concern of increased stormwater runoff paving could cause, which could affect the current litigation. (R.R. at 924a-25a, 997a.) In addition, as the trial court noted, Township runs the risk of expending monies to improve Ainsley Lane, potentially increasing stormwater runoff, and then having to pay Laskey the same amount pursuant to the assignment of Texas Eastern's claim to Laskey. (FOF ¶ 60.) Under these circumstances, we cannot say the trial court erred in finding that Gallo did not meet his burden of proof on his Petition based on the allegations related to the baseball field and Ainsley Lane.[10]

### b. The increase in size of the pond on Gallo's property

Appellants next claim that Township is liable for a *de facto* condemnation due to the flooding of the properties and creation of wetlands resulting from the increase in size of the pond on Gallo's property. The trial court concluded these issues were the result in the elimination of the drainage for Gallo's property through the drainage ditch or swale on Gallo's, Holt's, and/or DMC's properties and/or manmade changes

---

[10] While our reasoning differs from the trial court's, we may affirm on different grounds where such grounds for affirmance exist. *Smart Commc'ns Holding, Inc. v. Wishnefsky*, 240 A.3d 1014, 1016 n.2 (Pa. Cmwlth. 2020).

26

to the elevation of the various properties involved, and that Appellants did not prove that Township engaged in intentional conduct that caused these situations. (COL ¶¶ 11-12, 18.) We agree with the trial court's assessment.

As to the drainage swale or ditch on the Holt property that had drained the pond in the past, the trial court found that no witness stated how, where, or when the drainage swale had been filled, raised, or narrowed or became "degraded." (FOF ¶ 19.) As for DMC's 2006 stormwater management plan, the record reveals that Township's engineer did review that plan and found it to comply with the Stormwater Ordinance, and Township issued a letter so indicating. (R.R. at 1136a-37a.) That it may have been mistaken in its conclusion does not mean that **Township took action** that "diverted [] water from its natural channel or changed the quality or quantity of water flowing onto the property." *McMaster*, 161 A.3d at 1036. Of note, even Gallo himself testified that he was unsure how DMC's filling in the ditch would affect the stormwater flow on his property. (R.R. at 1875a-77a.) Accordingly, we discern no error in the trial court's conclusion that Appellants did not meet their heavy burden of proving that **Township's** actions, as related to the drainage of the Gallo property, constituted a *de facto* taking of Appellants' respective properties.

This leaves Appellants' general arguments that Township's insufficient administration of the Stormwater Ordinance and allowing unchecked development within the MBIP without consideration of the stormwater effects of that development has caused flooding on Appellants' properties. To the extent Appellants rely on the development of the MBIP prior to 2005, Township had no responsibility for stormwater management at that time and any deficiencies are the result of the Redevelopment Authority, which settled with Appellants. As for post-

27

2005 development, Appellants point to several development projects that, upon Over's review, did not have a letter of concurrence reflecting Township's review and approval of a stormwater management plan related to the project. (*Id.* at 372a-81a.) However, it is unclear from the record that the non-issuance of a concurrence letter reflected Township's abdication of its obligations or something else. Over testified that when a land development plan is filed with the county, the county was supposed to send it to Township for review for compliance with the Stormwater Ordinance, which would then issue a concurrence letter if it was, after which the county would issue building permits. (*Id.* at 358a-59a.) Per Over, the filing of a concurrence letter is part of the county's approval process. (*Id.*) Thus, it is possible that, if no concurrence letter was issued, it was the county that improperly approved the plans, or that, as those plans were approved by the county, concurrence letters were issued, but not made a part of the files. On this record, it is difficult to say that Township **intentionally** abdicated its obligations to review and approve plans under the Stormwater Ordinance such that the trial court erred in finding that Township did not effectuate a *de facto* condemnation on this basis.

The lack of evidence of established intentional conduct by Township in the administration of the Stormwater Ordinance makes this matter distinguishable from *DeLuca*. In *DeLuca*, a landowner filed a *de facto* condemnation claim against a sewer authority alleging that the way the authority was intentionally operating its sewage system caused sewage to infiltrate her home on multiple occasions. 166 A.3d at 556. The authority argued the landowner was limited to bringing a trespass action because the damage to her property was not the "immediate, necessary, and unavoidable consequences of an eminent domain action." *Id.* at 561. We upheld a trial court's rejection of this argument, reasoning the evidence showed that the

28

authority was aware of the flooding of the landowner's property and intentionally operated its sewage system in a way it knew would result in new flooding of the landowner's property by accepting new customers, not installing recommended valves on the landowner's property even though it did so elsewhere on the system, and plugging her sewer lines when flooding was imminent thereby forcing her out of her home for a period of time. We concluded the authority took no efforts to fix the structural defects in its system, pursuing *ad hoc* remedies it knew would flood the landowner's property, resulting in her damages being a direct result of the authority's intentional actions taken incident to its power of eminent domain and a "purposeful and deliberate drainage plan." *Id.* at 563 (citation omitted). Here, unlike in *DeLuca*, the record, consisting only of an absence of concurrence letters, does not support that Township intentionally operated or administered the Stormwater Ordinance in a way that would support a finding of a *de facto* condemnation. Thus, *DeLuca* does not require us to reverse the trial court's Order.

## C. *Did the Trial Court Commit Other Reversible Errors?*

### 1. Parties' Arguments

Appellants further assert the trial court committed numerous errors that require reversal and the appointment of viewers. They contend the trial court erred in some of its evidentiary rulings, including sua sponte incorporating the record from Laskey's Trespass Action into this condemnation proceeding; finding that certain testimony by Owoc regarding Township's refusal to cooperate with DEP's recommended solution was inadmissible hearsay; and finding that only the ACE could designate an area a wetland and had not done so here. Appellants also argue that certain findings of fact were not supported by substantial evidence and, therefore, could not support the trial court's Order. Finally, Appellants contend the

29

trial court erred in sua sponte considering various legal issues in sustaining the POs, such as Appellants' failure to join DEP or seek mandamus or injunctive relief, and Laskey's settlement with Township's insurer in the Trespass Action. Beyond not being asserted in Township's POs and, therefore, improperly raised sua sponte, Appellants argue, these issues are not relevant to the condemnation proceeding and/or that the other actions the trial court stated Appellants should have sought could not have provided the relief Appellants seek in this proceeding.

Township does not appear to dispute that the trial court may have sua sponte addressed certain legal issues but maintains no reversible error occurred because the court was simply reviewing the evidence presented and issues developed at the hearings to ensure a legally correct decision was made. It disagrees with the assertion that Laskey's settlement with Township's insurer in the Trespass Action is irrelevant because that settlement reflects Laskey's attempt to recover multiple sets of damages arising out of the same basic problem, the flooding of his property by stormwater runoff. Township asserts the trial court did not err in concluding the properties are not wetlands as they have not been designated as such by any entity, including the ACE.

2. Analysis

Upon careful review of the parties' arguments, the trial court's Decree, and the record, we conclude that none of the claimed errors or allegedly unsupported findings of fact warrant reversal of the trial court's Order. Any error the trial court may have made in this regard did not affect the ultimate outcome of this matter, and any findings of fact that were not supported by substantial evidence were not necessary to the final decision. "It is axiomatic that we will not disturb a judgment, order, or decree on appeal for harmless error." *Campbell v. Dep't of Env't Res.*, 396

30

A.2d 870, 870 (Pa. Cmwlth. 1979). An error is harmless if "it does not affect the outcome of the appeal." *Weiler v. Stroud Twp. Zoning Hearing Bd.*, 300 A.3d 1121, 1131 (Pa. Cmwlth. 2023). *See also Garner v. Pa. Hum. Rels. Comm'n*, 16 A.3d 1189, 1200 (Pa. Cmwlth. 2011) ("[R]eversible error requires the determination 'must not only be erroneous, but also harmful or prejudicial to the complaining party.' *D.Z. v. Bethlehem Area Sch*[.] *Dist*[.], 2 A.3d 712, 726 (Pa. Cmwlth. 2010)."). Further, "[i]t is well established within our jurisprudence that an unsupported finding of fact which is not necessary to the adjudication merely constitutes harmless error." *Borough of Schuylkill Haven v. Prevailing Wage Appeals Bd*., 6 A.3d 580, 585 (Pa. Cmwlth. 2010).

### a. Laskey's Trespass Action

We begin with Appellants' claims about Laskey's Trespass Action, the record of which they argue should not have been incorporated by reference in this matter and the settlement of which is not relevant to Appellants' *de facto* condemnation proceedings. While we agree with Appellants that the sua sponte incorporation of a factual record from the Trespass Action into this *de facto* condemnation proceeding was error, particularly when it occurred without the parties' opportunity to object, we disagree that this requires reversal. It is unclear what findings the trial court made based on the incorporated evidence from that record, as our review of the trial court's findings reflects that they are premised on the evidence specifically presented in the *de facto* proceedings. Further, to the extent it is argued that the Trespass Action (and settlement thereof) is irrelevant, Laskey made it relevant when his counsel specifically represented that Laskey's condemnation claims were not based on stormwater runoff from the baseball field and Ainsley Lane because those issues were addressed in the Trespass Action. In fact, Laskey's counsel asked the trial court

31

to take judicial notice of the Trespass Action during Owoc's testimony. (R.R. at 822a.) Further, that separate action, or at least Laskey's continued assertion of Texas Eastern's cross-claim for return of $50,000, is relevant to Township's explanation as to why it is not improving Ainsley Lane at this time. Accordingly, we discern no reversible error on these bases.

### b. Other legal actions and wetlands determination

To the extent that the trial court sua sponte referenced other legal actions Appellants could have brought or parties Appellants could have joined, this, too, did not affect the outcome of this matter. In sustaining the POs and dismissing the Petitions, the trial court ultimately focused on **Township's** actions or inactions and whether that evidence supported the conclusion that no *de facto* condemnation occurred. It concluded that the evidence did not, and as explained above, we see no error in that determination. Appellants' assertion of error based on the trial court's finding that only the ACE can delineate property wetlands fairs no better. Whether the ACE, DEP, or a private consultant like Nelson or Gavaghan can delineate property wetlands has no bearing on the ultimate conclusion that Appellants did not prove that it was Township's actions that created any such wetlands on Gallo's and/or Laskey's properties.

### c. Rejection of Owoc's testimony

As for Owoc's testimony about Township's refusal to participate in DEP's plan, which Appellants argue, citing finding of fact 54, was impermissibly rejected as being based on multiple levels of hearsay where no objection to that testimony was made and other testimony corroborates Owoc's testimony, we discern no reversible error. Finding of fact 54 rejected Gallo's proposed finding of fact that

"Owoc advised Laskey by telephone that [Township's s]olicitor [] told [] DEP that [Township] was not going to permit the pipe necessary to reopen the ditch . . . unless Laskey dropped a lawsuit he had filed in 2011 against [Township] related to runoff from Ainsley Lane." (FOF ¶ 54.) The proposed finding of fact cited Laskey's testimony as to what Owoc told him the solicitor said, and not to Owoc's testimony. Unlike Owoc's testimony, which was not subject to a hearsay objection, Township did object to Laskey's testimony on the basis that it was hearsay. (O.R. (Laskey), Item 87 ¶ 220; R.R. at 831a-32a, 1965a-66a.) Notably, in response to the objection, Laskey's counsel responded it was **not** being offered for the truth of statement, yet the proposed finding of fact did just that. (R.R. at 1965a-66a.) Even if Laskey's hearsay statements were corroborated (in their essence) by Owoc's testimony that Matthews told her this and were subject to an exception to the hearsay rule related to a statement by a party-opponent, the trial court nonetheless rejected the premise of the need for Township's participation in this project, reasoning that the existing culvert was of sufficient size and did not need to be replaced. Accordingly, any error the trial court may have made in rejecting Gallo's proposed finding of fact on the basis of hearsay was harmless.

     d. Challenged findings of fact

This leaves Appellants' challenges to six findings of fact and the trial court's statement that Laskey's claim was limited to downhill drainage issues, rather than stormwater runoff from Ainsley Lane, the baseball field, and Texas Eastern, as being unsupported by substantial evidence or irrelevant to the issues. With regard to the challenge to the trial court's statement as to the scope of Laskey's condemnation claim, (Decree at 2), Laskey specifically disclaimed the stormwater runoff from Ainsley Lane and the baseball field as being a part of his *de facto* condemnation

33

claim, as discussed above. Similarly, Appellants challenge the trial court's reference to Laskey's separate litigation and settlement thereof, (FOF ¶ 14), as being irrelevant because it related to Laskey's business property. But, as set forth above, Laskey requested that the trial court take judicial notice of that case and that Laskey's *de facto* condemnation claim was not based on flooding issues that had been resolved in that litigation.

Appellants' remaining challenges are as follows. They argue that the letter from the Redevelopment Authority advising Gallo of the wet conditions of the property, (FOF ¶ 5), to show that Gallo was aware of the existing condition of the property, which Gallo testified he never received, was not admitted into evidence, although Appellants' counsel acknowledged the existence of the letter. (R.R. at 1894a-95a.) However, any error in this regard was harmless because Gallo testified independently that the price he paid for the property was reasonable because of the low-lying nature of the property compared to the surrounding properties. (*Id.* at 72a-74a.) Appellants next argue the trial court's finding that there was a lack of credible evidence that Township's culvert, through which stormwater would drain as part of the proposed solution, was insufficient, (FOF ¶ 47), where Owoc testified that the proposed plan "required the resizing and replacement of the [Township] culvert," (Gallo's Brief (Br.) at 59 (citing R.R. at 831a-32a); Laskey's Br. at 61 (same)). A review of Owoc's testimony, however, was that it was "likely" that the culvert needed to be enlarged, not that it had or was required to be enlarged. (R.R. at 831a.) The challenged finding reflects that the trial court did not credit Owoc's testimony in this regard, and that determination was for the trial court, not this Court, to make. *Parkview Ct. Assocs. v. Delaware Cnty. Bd. of Assessment Appeals*, 959 A.2d 515, 521 (Pa. Cmwlth. 2008).

Appellants further challenge the trial court's rejection of Gallo's proposed finding of fact that the Gallo and Laskey properties lay below Gist Run and, therefore, water could not be discharged into it, on the basis that the actual elevations of the properties as they relate to Gist Run were never provided, despite being requested. (FOF ¶ 48.) Appellants argue the exact elevations were not required for them to prove their case, Owoc testified that they were lower than Gist Run, and, therefore, the fact that they were not established was irrelevant. Over testified that knowing the elevations of the properties as they relate to Gist Run was important to what solutions were available to resolve the issues and were not provided, (R.R. at 786a-91a), and the evidence reflects that the elevations of the properties changed through manmade processes (such as Gallo adding fill to his property). Thus, we discern no error in the trial court wanting more specificity in the evidence to support Gallo's proposed finding of fact. Moreover, as the trial court held, and we affirm, that Appellants did not satisfy their heavy burden of proving that Township's actions constituted a *de facto* condemnation, the finding relating to a solution for the flooding issue was not necessary to the trial court's determination. This makes any lack of record support for that finding harmless error. *Borough of Schuylkill Haven*, 6 A.3d at 585.

The last two challenged findings of fact relate to Township's actions in regard to improving Ainsley Lane. Appellants challenge the trial court's findings that Township was justified in not paving Ainsley Lane and installing the drainage pipe on Laskey's property pending resolution of ongoing litigation and that Laskey refused to provide an easement for Township to accomplish the latter task. (FOF ¶¶ 58, 60.) On the latter point, Appellants cite Laskey's testimony that he was not asked for an easement and was only offered money to put in the pipe himself. (R.R.

at 2130a, 2392a-93a.)  Matthews testified that Township offered to put the drain in for Laskey, and "[Laskey] denied having anything to do with it" and denied the money to install the drain himself.  (*Id.* at 924a.)  Thus, while the trial court's characterization of Laskey's refusal as the denial of an "easement" may have been inaccurate, the finding that Laskey refused to allow Township to install the drain on his property is supported by Matthews' testimony.  As for Township's actions being "justified," we discern no error in the trial court's finding where the testimony established that Township was not refusing to perform the work at all but was waiting for the outcome of the ongoing litigation, which related to the $50,000 payment from Texas Eastern, and there was a concern about paving the road increasing the impervious surfaces over which stormwater runoff would flow.

For the foregoing reasons, the trial court did not commit any other legal errors that require reversal of its Order.  Further, upon our review of the record, the challenged findings of fact are either supported by substantial evidence or, if not, were not necessary to the ultimate determination in this case, making any error harmless.[11]

---

[11] On February 1, 2024, Township filed a "Motion to Amend Reply Brief" (Motion to Amend), seeking to advise the Court that Gallo's estate had sold the property in two parts:  a 10.15-acre parcel at the rear of the property to Holt for $325,000; and a 2-acre parcel on which Gallo's business facilities are located to a third party, which is owned by Gallo's brother, for $40,000. (Motion to Amend at 3-4.)  Although not stated expressly in the Motion to Amend, Township appeared to be asserting that the Gallo case is now moot, but at oral argument, Township represented that this information went to the credibility of Gallo's testimony regarding the property's lack of value due to the flooding.  While we grant the Motion to Amend, the information provided does not affect this appeal.  As for Township's argument regarding Gallo's credibility, questions of credibility are for the trial court as factfinder, and not for this Court.  *DeLuca*, 166 A.3d at 560 n.8.  More importantly, as to an implied assertion that the Gallo petition is moot, because "[t]he right to [] damages [resulting from a governmental taking] is personal, belonging to the owners of the land when the entry and injury takes place, and the damage[s] do not run with the land nor pass by a subsequent conveyance[,]" the conveyance of the property does not affect **(Footnote continued on next page…)**

## III. CONCLUSION

It is undisputed that stormwater runoff flows from numerous properties within the MBIP onto the lowest properties in the MBIP, which are Gallo's and Laskey's properties. It is further undisputed that something occurred to the drainage swale or ditch on Gallo's, Holt's, and DMC's properties to block Gallo's property from draining, as it once did, into Gist Run. Appellants have chosen to assert that Township is liable for the damages caused by these facts, but in doing so, they bore a heavy burden of proving a *de facto* condemnation. The trial court concluded, based on the evidence and arguments submitted, that Appellants failed to satisfy that heavy burden. For the reasons set forth *supra*, we discern no reversible error or abuse of discretion in the trial court's conclusions. Accordingly, we affirm the trial court's Order sustaining Township's POs and dismissing Appellants' Petitions.

_____

**RENÉE COHN JUBELIRER,** President Judge

---

Gallo's personal claim for damages arising from the alleged *de facto* condemnation. *Kaufmann v. City of Pittsburgh*, 93 A. 779, 780-81 (Pa. 1915). *See also Synes Appeal*, 164 A.2d 221, 223 (Pa. 1960) (same) (quoting *Kaufmann*); *Palm Corp. v. Dep't of Transp.*, 688 A.2d 251, 254 (Pa. Cmwlth. 1997) (same) (citing *Synes Appeal*); *Florek v. Dep't of Transp.*, 493 A.2d 133, 136 (Pa. Cmwlth. 1985) (same) (citing *Synes Appeal*).

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ronald L. Gallo                                    :  CASES CONSOLIDATED
                                                   :
            v.                                     :  No.  131 C.D. 2022
                                                   :
North Union Township and                           :
Redevelopment Authority of the                     :
County of Fayette                                  :
                                                   :
Stephen R. Laskey                                  :
                                                   :
            v.                                     :
                                                   :
North Union Township and                           :
Redevelopment Authority of the                     :
County of Fayette                                  :
                                                   :
Appeal of:  Cindy Lou Gallo and the                :
Estate of Ronald Leo Gallo                         :

Ronald L. Gallo                                    :
                                                   :
            v.                                     :  No.  132 C.D. 2022
                                                   :
North Union Township and                           :
Redevelopment Authority of the                     :
County of Fayette                                  :
                                                   :
Stephen R. Laskey                                  :
                                                   :
            v.                                     :
                                                   :
North Union Township and                           :
Redevelopment Authority of the                     :
County of Fayette                                  :
                                                   :
Appeal of:  Natalie R. Laskey and the              :
Estate of Stephen R. Laskey                        :

# **O R D E R**

**NOW**, March 15, 2024, the Order of the Court of Common Pleas of Fayette County, entered in the above-captioned matters, is hereby **AFFIRMED**. Additionally, North Union Township's "Motion to Amend Reply Brief" is **GRANTED**.

_____
**RENÉE COHN JUBELIRER,** President Judge